## No. 13,733.

### E. A. Billet vs. The Times-Democrat Publishing Company.

#### Syllabus.

1. In an action for damages for libel, where "privilege" is set up as a defense, the evidence should be confined to the question of privilege, *vel non*, save in so far as it may be admissible in mitigation of damages.

2. In such a case, an amendment setting up the truth of the alleged libel in justification, may be allowed, if the offer to amend be reasonable as to time. The defense is not inconsistent with that of "privilege," and there is no change of issue in the sense of substituting one issue for another.

3.   Reports made by police and detective officers to their superiors and inscribed
     in books kept for that purpose are not judicial proceedings and no privilege
     protects their publication. Nor, does any privilege protect the publication of
     the opinions, suspicions, or deductions, of such officers, otherwise imparted,
     whether to their superiors or to other persons.

A PPEAL from the civil district court, parish of Orleans—*Ellis, J.*

*D. M.* and *Allan Sholars,* for plaintiff, appellant.

*Lawrence O'Donnell (Denegre, Blair & Denegre,* of counsel), for defendant, appellee.

### STATEMENT.

The opinion of the court was delivered by

MONROE, J.   Plaintiff sues for damages for injury alleged to have been sustained by reason of the publication in the "Times-Democrat," a newspaper owned and controlled by the defendant, of the following article, which he alleges is malicious, wanton and defamatory, to-wit:

### "LOST MONEY FOUND.

*"The $500 Which Mysteriously Disappeared from Mrs. Behm's Safe Strangely Recovered.*

"A case where great protestations of love and breach of trust figured was developed last Sunday, when the local police authorities, especially the detectives, were communicated with by Emile A. Billet, who, in partnership with Mrs. Louis J. Behm, conducts a grocery establishment at the corner of First and Dryades streets.   Billet telephoned to the police headquarters that a safe which had, he alleges, carelessly been left open, was rifled of a sum aggregating $500.   The mysterious manner in which the sum had been stolen, and the very unsatisfactory way he went about explaining the matter to Detectives Stubbs and DeRance aroused their suspicions as to the real thief, and it was not very long before they became convinced of the fact that Billet was the one who had appropriated the $500.

"Billet, in explaining the robbery to the detectives, said that Mrs. Behm, as was her custom, went to the market, and a short while subsequent to her return home the loss of the money was discovered. Billet alleges that he was under the impression that the safe was locked, and

felt assured of the safety of the money, and he impressed Mrs. Behm with the same idea. In notifying the police, Billet requested that an investigation of the matter be held, and the above named detectives lost no time in arriving on the scene of the alleged robbery. They were shown the safe wherefrom the $500 was supposed to have been stolen. Upon an investigation of the premises and of the circumstances surrounding the robbery, the officers said that they were firmly convinced of Billet's guilt. In substantiating their allegation, they claim that it was next to an impossibility for any one to have stolen the money except whosoever may have had immediate access to the premises, such as Billet possessed. They did not hesitate to impress Billet with the idea that they believed him guilty. Accordingly they approached him, and, so the detectives allege, said that if he (Billet) did not replace the $500 by eight o'clock, they would place him under arrest on the charge of theft. Of course, Billet made protestations in which he maintained his innocence, but it was of no avail. After speaking thus to Billet, the officers left the grocery, saying that they would return at the aforesaid hour.

"About 6:30, or 7 o'clock, Mrs. Behm, acting on Billet's suggestion, decided to make another investigation of the safe. She summoned her mother and Billet, and they opened the safe. Mrs. Behm, in her examination, pulled out one of the drawers of the safe, wherein it was the custom to keep whatever paper money she had in the house. Finding this empty, as far as the $500 was concerned, she extracted the second and last drawer, little expecting to find the money there. Much to her astonishment and, apparently, to Billet's, the package of bills, which had been missing, was found. When this discovery was made, there remained about an hour of the time allowed Billet by the officers to 'find' or restore the money. The detectives maintain that they had made a thorough examination of the safe and of its contents. However, Billet alleges that they were mistaken and denies that they looked into the safe at all. It is said that Billet and Mrs. Behm are engaged to be married. The latter is at present suing her husband for a divorce, but, in the meanwhile, is living with Billet. He has had considerable experience in the grocery business and has been robbed on several occasions."

The defendant answered as follows:

"Now into court comes the Times-Democrat Publishing Company

and for answer to plaintiff's demand, admits that the words complained of were published in the newspaper as aforesaid. But denies that it was done maliciously, but are *bona fide* comments on matters that became, and were, matters of public notoriety, etc., discussion, and were published in the course of conducting a newspaper, and are therefore privileged." And there is a prayer for judgment.

The counsel in the case began the taking of testimony on behalf of the defendant out of court, but the counsel for plaintiff objected that such testimony was irrelevant, for the reason that the answer admitted the publication and claimed that it was privileged, without affirming the truth of the statements therein contained. And this objection was reserved to be passed on by the court. Some days later, and whilst the taking of testimony in its behalf was still going on, the defendant filed an amended answer, reiterating the defense originally set up, and containing the following additional averments, to-wit:

"Defendant avers that said publication was made in good faith, and upon reliance on the official public reports of the police authorities of the city of New Orleans, and was substantially true and correct as to all the facts stated; that, in making the said publication, the defendant was carrying out its purpose of publishing legitimate news, upholding morality, and that it was not actuated by any other purpose."

Objections to testimony offered in support of these averments were also referred to the court, and they, together with the objections previously mentioned, were overruled, and there was judgment for the defendant.

The facts disclosed by the record are as follows, to-wit:

The plaintiff and Mrs. Behm are the proprietors of a grocery on the corner of First and Dryades streets in this city, which is conducted, mainly, in the name of Mrs. Behm, though the parties are equally interested,—the purchases for the business being made indifferently in the name of either, and the financial management being, practically, under the exclusive control of the plaintiff. In a room, occupied as a sleeping apartment, immediately adjoining the store, there was an iron safe, in which, at the time of the occurrence out of which this suit arose, there were six or seven hundred dollars in money, together with some books and papers and a few articles of value other than money. Inside of the safe, there were four compartments, or pigeon-holes, one above the other. In the upper compartment, or pigeon-hole, was an iron

drawer, secured by a lock. In the next compartment, below, which measured, approximately, 3½x5½ inches in height and width by about six, or eight, inches in depth from front to rear, was a wooden drawer, without a lock, and below the compartment containing the wooden drawer were two other compartments of the same size; so that, the wooden drawer would as readily fit in the one as in the other. In the wooden drawer, upon the occasion in question, there were thirty-five or forty dollars in nickels. In the compartment next below, there was a roll of bills amounting to $500, and consisting of two or three one hundred dollar bills, and the rest in bills of the denominations of $20, $10, and $5. And in the lowest compartment, there was a bag of silver coin. On Sunday morning, February 11, 1900, the plaintiff arose early and opened the store, but, shortly afterwards, wishing to get change for a two-dollar bill, he went to the safe for that purpose. The morning was dark and rainy and the safe was unfavorably situated with respect even to the little light that penetrated the room; he, therefore, held a lamp in one hand while he adjusted the combination and opened the safe door with the other. When he had opened the door, he placed the lamp on the safe, took out the drawer containing the nickels and put it on the bed, and after taking from it the change that he needed, replaced the drawer, as he supposed, in the compartment from which he had taken it, closed the door of the safe and returned into the store. As a matter of fact, however, he had, by reason of the obscurity, mistaken the compartment and had put the drawer into the one which contained the $500 in bills, so that, when the drawer was pushed in and the door of the safe closed, some of the bills were shoved back and occupied the space between the rear end of the drawer and the rear end of the compartment and some of them were pressed down underneath the drawer. Later in the morning, about eight o'clock, it being then lighter, the plaintiff had occasion to go again to the safe, and, upon opening it, he missed the roll of paper money, and the fact that he had made the mistake as described not suggesting itself to his mind, he concluded that he had been robbed, which conclusion he at once communicated to Mrs. Behm, asking her, at the same time, whether she had taken the money. Upon her replying in the negative, he, immediately, telephoned to the police department and, after he had waited several hours and made several efforts in that direction, two detectives, Stubbs and DeRance, appeared upon the scene. Those officers inquired

who had the combination of the safe and who had access to the premises, and, probably, made other pertinent inquiries; and the safe was opened and exhibited to them; but, whilst the wooden drawer was pulled partly out, so that they could see its contents, it did not occur to any one to take it entirely out of the compartment and look behind or underneath it. Officer Stubbs, in view of the fact that the plaintiff alone knew the combination by which the safe could be unlocked, and of such other information as he obtained, reached the conclusion that the money was in the possession of the plaintiff, and he so stated to Mrs. Behm. Officer DeRance does not seem to have shared that opinion, and it is not pretended that the plaintiff, who is shown to be very deaf, heard the statement made by Stubbs, though both officers testify that it was communicated to him by Mrs. Behm. Upon the other hand, Mrs. Behm testifies that she did not, for a moment, consider the statement as having been seriously made, and that the idea seemed to her preposterous, since most of the missing money belonged to the plaintiff, who could, without objection from her, at any time, have disposed of the whole of it. The officer who made the statement referred to testifies that before leaving he said to Billet, "You put that money back, because I am coming back here again. I will be back here again to-night or to-morrow morning." The other officer testifies that his companion said to Mrs. Behm, "We will be back in a day or two, or something likke that, and we want the money placed back. No witness intimates that anything was said about the officers returning at eight o'clock that night or that any threat was made that Billet would be placed under arrest on the charge of theft. Upon the whole, we are satisfied that the plaintiff was not made aware that either of the officers had seriously charged him with having taken the money, and he could not have been aware that he was threatened with arrest, since no such threat was made. During the day, probably, just after the departure of the detectives, the plaintiff and Mrs. Behm were interviewed by the corporal of police who was in command of the precinct in which their store was situated, and he reported to his captain, who, in turn, handed in the following written report to the superintendent of police, to-wit:

"SIXTH PRECINCT—DEPARTMENT OF POLICE.

"City of New Orleans, Febry. 11 ,1900.

*"To the Superintendent of Police—*

"Sir:—On the 11th day of February, 1900, at 12:30 M., Corporal Perez reported the following:

"Name and place of party suffering loss—Mrs. Louis J. Behm, Dryades, cor. First st.

"When and how loss occurred—Enter, day time, and grand larceny.

"Where it occurred—Dryades, cor First st.

"List, description and value of each article stolen—Cash money, U. S. currency, $500."

"Corporal Perez reports between 7:30 and 8 A. M., this date, some unknown person entered the bedroom of Mrs. Lizzie J. Behm, in the rear of her grocery, corner of Dryades and First streets, while she was absent at market, and stole from an iron safe, which had been left unlocked, $500 of United States currency of the denominations of $5, $10, and $20 bills. There was, also, $20 in silver money and two diamond rings, valued at $100, in the safe, which were not stolen. The corporal interviewed Mr. Emile J. Billet, the manager for Mrs. Behm, who, with Bertha Dennis, the colored cook, were the only ones in the house at the time of the robbery, and he says he saw the money when he was last at the safe, at seven this A. M., and missed the money when he went there again at 11 A. M. The colored servant saw no strange person about the place and could form no idea as to how the robbery occurred."

On the night of the same day, about half-past ten o'clock, after the store had been closed, Mrs. Behm and her mother made a search of the entire room containing the safe, and, being unsuccessful, Mrs. Behm finally suggested to Billet that they should once more examine the safe, and take everything out, and she thus describes their proceedings: "I sat on the bed while he pulled things out, books, papers, receipts and other valuable things that were in the safe. Now we had pulled it all out except this drawer, and I said to him, pull the drawer out too, and give it to me, here. And, as he pulled the drawer out, I saw some bills, lying flat down, and I ran my hand there, and there was the roll of money, crammed behind the drawer, some at the bottom, some at the back, like you would jam something in a hole."

The discovery thus made was communicated to the police officers on the beat early the next morning, and they informed Mrs. Behm that they would convey the information to headquarters, and, during the day, the following report appears to have been made by the detectives, who did not, however, again visit the store, to-wit:

"DEPARTMENT OF POLICE, CITY OF NEW ORLEANS.

"Detective Office, New Orleans, La., Febry. 12, 1900.

"Detectives on case—Stubbs and DeRance.

"Case No.—921.

"Residence—Dryades and First sts.

"Location of offense—Dryades and First sts.

"Date committed—Feb. 11 between 7 and 8 A. M.

"Character of offense—Grand larceny.  $500.

"Date reported—Feb. 11.

"Parties arrested— ————————

"DETAILED REPORT.

"We investigated said case and was satisfied in our own minds that there was no robbery committed by any outsider, and made it known to Billet. The money was placed back in the safe and found by Mrs. L. J. Behm, who lives in the house with Billet."

Upon the morning of the day upon which this report was made, there had appeared in the Times-Democrat, an article, referring to the subject under consideration, entitled "A Strange Robbery," concerning which and concerning the further action taken, the, then, city editor of the defendant's paper testifies as follows, to-wit: "Inasmuch as the facts contained in the article are purported to be based on the official police report, and inasmuch as the tenor of the article led me to believe that there was something else in the story, I proposed to look into the matter further." He also states that a member of the local staff of the paper told him, during the day, that Detective Stubbs had told him, the reporter, "of some man who had robbed himself—I think that was the way he put it"; that he telephoned to another reporter to see the detective, but that the other reporter was too busy, and that he then instructed still another attaché of the paper, who had done some "space work," to investigate the case, and write it up, giving the parties in interest the benefit of their own statements; but that, before publishing the article, which was written up under the instructions so given, being the article here complained of, he had a conversation with Detective Stubbs, through the telephone, in which that officer confirmed what he had heard from his reporter and told him that there was no possible chance that the money was in the safe upon the occasion of his visit to the defendant's store, and also told him something about the relations existing between the plaintiff and Mrs. Behm, and about a divorce, or

pending suit for divorce, between Mrs. Behm and her husband. The space writer by whom the offending article was prepared interviewed the plaintiff and Mrs. Behm on the morning after the discovery of the money, and was shown the safe, and given a full explanation of the whole matter. He had access to the reports which by that time had been handed in at headquarters, but does not appear to have consulted them, or even to have interviewed the officers by whom they were made. It is not suggested that the defendant has ever offered any reparation to the plaintiff, but, as we have seen, even now, affirms that the publication complained of was "substantially true and correct."

## Opinion.

The original answer rested the defense solely on the ground that the publication was privileged, and the evidence should have been confined to the question of privilege *vel non,* save in so far as it may have been admissible in mitigation of damages.

The supplemental answer affirms the truth of the statement published, and thus presents an additional defense, and introduces a new issue. But the defense thus presented is not inconsistent with the original defense, and there is no *change* of issue in the sense of substituting one issue for another. Under the circumstances, and as the amendment was offered before the case was put on trial, we are not prepared to say that it was improperly allowed. C. P. 420.

The justification set up in the supplemental answer has not, however, been sustained by the evidence.

"In giving currency to libellous or slanderous reports and publications a party is as much responsible, civilly and criminally, as if he had originated the defamation." Staub vs. VanBenthuysen, 36th Ann. 467. "Tale bearers are as bad as tale makers." Harris vs. Minvielle, 48th Ann. 908.

In undertaking, therefore, to justify, by proving the truth of the facts stated, the defendant not only assumed the burden of proving that the detectives made the statement attributed to them, but of proving that those statements were true. And it has not met the requirements of the case in either respect. It has not been proved that the plaintiff was the real thief, or that he took or, intentionally, concealed the money which was supposed to have been stolen. On the contrary, it is shown, conclusively, that, before the publication of the article in

which that language was applied to him, an explanation had been made, which should have satisfied any reasonable mind, that the money had not been stolen or intentionally concealed by any one, and which made it plain that if the plaintiff had taken it and had appropriated it to his own use he would have been guilty of no crime. It has not been proved that the detectives were convinced that the plaintiff had appropriated the money, for one of them, DeRancé, testifies that he was not of that opinion. It has not been proved that the detectives impressed the plaintiff with the idea that they believed him guilty, since the evidence shows that that suggestion was only made by Stubbs to Mrs. Behm, who did not take it seriously, and hence did not communicate it, as a serious charge, if at all, to the plaintiff. It is not pretended by any witness that the detectives, on leaving the house, notified the plaintiff that they would return at eight o'clock and would place him under arrest on the charge of theft unless the money was replaced in the meanwhile. And it is shown that the money was not found in the last remaining hour of the delay thus said to have been allowed and as the result of a search suggested by the plaintiff, but that it was found some hours later, during a search suggested by Mrs. Behm.

The only question, then, is, whether the publication, as true, of the injurious statements in question, is protected by any privilege? We know of no law to that effect. There would have been no privilege, whether absolute or conditional, even if the defendant had confined itself to the publication of the reports as made by the corporal of police and the detectives, and as entered upon the books kept by the superin-tendent of police or the chief of detectives for that purpose, since neither common convenience nor the interests of society require that the opinions, suspicions and deductions of police and detective officers, whether reported in writing to their superior officers, or through the telephone to the newspapers, should be published to the world. Such reports are in no sense judicial proceedings, and their publication is entitled to no greater privilege than that of reports emanating from private individuals. Where a proceeding, in the nature of a criminal prosecution, or in a civil suit, has actually been filed, in a properly constituted tribunal, and there has been a judicial hearing of some kind, the publication, without malice, of a fair and accurate report of what has taken place before such tribunal is privileged, though whether the privilege attaches where the proceedings are merely preliminary and

*ex parte* is not so well settled. An author of recognized authority says, upon the latter point: "The right to publish reports of *ex parte* proceedings and preliminary examinations, and the like, does not seem to be fully conceded by the law. The weight of authority is in favor of extending the privilege to report of arrests, on information gained from papers on file, so long as such reports do not assume the guilt of the accused person and are not otherwise defamatory."

Newell on Defamation, Slander and Libel, p. 549.

So, it has been held that a newspaper may report the fact that a person has been arrested and held for examination on a particular charge, but that it has no right to go beyond this and assume the guilt of the person charged. Tresca vs. Maddox, 11 Ann. 206; Usher vs. Severance, 20 Me. 9.

Upon the other hand, it has been held that the publication of a statement made by a justice of what had been said by persons applying to him for a warrant, which statement, not appearing in any affidavit, was made as part of a hearing, was not privileged.

McDermott vs. Evening Journal Association, 43 N. J. 488.

That reports made to police officers charging persons with crime are not judicial proceedings, the publication of which is privileged. Jastremski vs. Marx Nansen, 120 Mich. 677; McAllister vs. Detroit Free Press, 76 Mich. 343. And that entries in books kept by detectives are not judicial proceedings, and no privilege protects their publication. Fullerton vs. Berthraume, 6 Quebec Sup. Ct. 342.

"It is well settled that, in the absence of statute, newspapers, as such, have no peculiar privilege, but are liable for what they publish in the same manner as the rest of the community, and this, whether the publication is in the form of an item of news, an advertisement, or correspondence." Am. & Eng. Ency. of Law (2nd Ed.), Vol. 18, p. 1051. Fitzpatrick vs. Publishing Company, Limited, 48th Ann. 1116.

No special damages have been proved, nor was it necessary that they should have been. "Damages, or injury, may be inferred from the nature of the words written, and from the circumstances under which they were written, without specific proof." Warner vs. Clark & Co., 45 Ann. 863.

In Tresca vs. Maddox, 11 Ann. 206, the court found that the publication of the libel was followed, upon the next day, by a recantation, and that the reputation of the plaintiff was vindicated by articles writ-

ten by the employé by whom the libel had been penned and subse-
quently published in the same paper. Nevertheless, it was said, "The
injury had been done *Vox semel missa non revertit.* The slander cir-
culated by one issue of the paper could not be wholly obliterated by
recantation in another."

In the case at bar, there has been no recantation nor reparation of
any kind. On the contrary, the defendant has affirmed the truth of the
libel complained of by averments in its pleadings which it has failed
to sustain by proof.

For the reasons thus assigned, it is ordered, adjudged and decreed
that the judgment appealed from be annulled, avoided and reversed,
and that there now be judgment in favor of the plaintiff, E. A. Billet,
and against the defendant, The Times-Democrat Publishing Company,
in the sum of five hundred dollars, with legal interest thereon from
judicial demand, and costs in both courts.

Rehearing refused.

BREAUX, J., believing the amount allowed should be at most nominal,
dissents in this case.