Statement of the Case.
MONROE, J.
Plaintiff brings this suit against six individuals (four of them said to be operating the City Park race track and the other two acting as “so-called” judges of the race) and four corporations (said to be engaged in the publication of newspapers), alleging that the individuals falsely accused him of swindling and of conspiring with one Wishart to cheat and swindle in the running of races at said track without affording him an opportunity to defend himself, and that they published their accusations in the newspapers of the other defendants, and caused them to be published also in New York and St. Louis papers. He alleges that he makes the publications mentioned by him part of his petition, and that he has been injured to the extent of $25,000, for which he prays that he have judgment.
Defendants filed exceptions of vagueness and no cause of action, which were overruled. The newspaper companies then answered, admitting the publications attributed to them, denying malice, and alleging that the matter published was legitimate news, and is true. The other defendants deny that they were operating the City Park race track, and four of them (Barnes, Heaslip, Lagarde, and Corrigan) deny that they employed the other two as judges, all of them alleging that the track was operated by a corporation known as the “City Park Jockey Club,” of which Barnes was president, Heaslip vice president, and Lagarde secretary, the latter owning no stock in the corporation. Murphy and Trevelyan (the other individuals made defendants) allege that they were employed by the club as judges; that the club is affiliated with the American Turf Association, a governing racing body, under the rules of which they had the right, and it was their duty, to “rule off the turf” any one who might so conduct himself at the tracks over which they might be presiding as to bring racing into disrepute; that under the authority so vested in them on February 8, 1906, they ruled plaintiff off the turf, and that he can have no cause of complaint thereat, for the reason that he entered the City Park race track knowing that it was operated under the rules stated, and thereby submitted himself to the jurisdiction of the constituted authorities.
They further allege that plaintiff was ruled off for conduct that was calculated to bring racing into disrepute, in that -he entered into a conspiracy to defraud. They deny that they made or caused to be made either of the publications complained of.
It appears from the record that plaintiff’s counsel offered in evidence the different newspapers referred to in the petition, and then made the statement:
“Gentlemen of the jury, we are not suing these defendants for ruling Mr. Rabb off the track. We are suing them for publishing the false accusations. Now I read the charge, a totally different thing-. A man might be ruled off the track.”
*177 One of defendant’s counsel here interposed an objection which led to the court saying to the jury that the statement of plaintiff’s counsel was his interpretation of the matter, and thereafter plaintiff's counsel appears to have read the publications complained of and to have “rested” his case. Counsel for defendants then moved the court to instruct the jury to bring in a verdict of non-suit, and, after some discussion (during which the jury was retired and the court ruled) made the following statement, to which no objection was made, or exception taken by plaintiff’s counsel, to wit:
“Gentlemen of the jury, in compliance with the suggestion made by the court, while the jury was retired, in so far as the defendants Samuel F. Heaslip, Louis D. Lagarde, Francis Trevelyan, Jos. A. Murphy, Ed. Corrigan, and David H. Barnes are concerned, the case is closed; the plaintiff and defendants resting their case on the testimony that has so far been adduced. Therefore, in considering your verdict in the matter, you will pay attention to what has occurred up to this part of the proceedings ; all further evidence having reference to the newspapers.
“By the Court: I understand that the case is closed now as to all the defendants except the newspapers?
“By Mr. Adams (counsel for defendants): ‘Yes, sir.’ ”
And the trial then proceeded upon ' the theory thus announced. Joseph A. Murphy testified that he and Trevelyan were employed as judges by the— ‘
“City Park race track, though the corporate name was ‘City Park Jockey Club’; that they ruled plaintiff off the track principally, though not entirely, upon the testimony of Mr. Edg-cumbe, who was, or had been, official timer at the Union race track in St. Louis; that the duties of judges are to place horses at the finish, to pass on all questions of foul riding, and to enforce discipline against jockeys, owners, trainers, or bookmakers who are engaged in fraudulent practice in contravention of the rules of racing; that he suspended Kirby D. Orr’s stable in St. Louis in 1905 in connection with the running of Capitano, the same horse that ran in New Orleans the following winter; that plaintiff’s reputation was bad; that he (plaintiff) was not present when Edgcumbe gave his testimony, and had no notice to be present; that under the recent rule the powers of judges of a race track cease with the close of the present meeting, and anybody who is disciplined has the right of appeal to the association and the main body, which in that case was the American Turf Association. Consequently our rulings are ex parte, because it is more of an indictment than a final ruling.”
The witness further testified that the ruling in question was‘made by Trevelyan and himself in writing, and he identified the original instrument, which was offered in evidence, but is not in the record.
U. S. Wishart, called by defendants, testified that he was an owner and trainer of horses at the City Park race track, and, with plaintiff, was ruled off the turf on February 8, 1906; that plaintiff was introduced to him at the Suburban track by Kirby Orr, who told him that plaintiff was a great better, and that he wanted to make him a winner; that witness, having two horses to start, Tarpy and Ott Seago, was confident of the former .and that plaintiff bet on him and divided his winnings with Orr; that after-wards (as we understand the testimony) plaintiff came to witness’ house one night, and wanted him to run Tarpy at the Suburban track, said he would put in a book, and guaranteed that he would take in $1,000, and ¡would “cut the sheet” (divide the winnings) with witness; that subsequently, at witness’ suggestion, plaintiff bet on Tarpy at the City Park race track, and, after the race, stuck a roll of money in -witness’ pocket which, when counted, amounted to $40; that in January, 1906, plaintiff and Orr spoke to witness about Pat Bulger, a horse that he was training for R. L. Thompson of New Jersey, and were told by him that Pat Bulger could not win the race for which he was entered; that witness’ son, a jockey who usually rode for him, would ride Airship (another horse, entered for the same race); and that witness had employed Nicol (reputed to be an honest boy and the best jockey on the track) to ride Pat Bulger. Witness states that in the opinion of horsemen Pat Bulger was the best horse entered for the race, and he explains what he there *179 after did and left undone by way of accounting for bis confidence in tbe inability of tbe best borse and favorite, with tbe best jockey (and an bonest boy) on bis back, to come in a winner; tbe explanation being about as follows: When tbe borse was expected to win, be was provided with blinkers, and was given a “toddy to keep bis tbroat open,” but on tbe occasion in question be was denied both blinkers and “toddy.” On the other hand, tbe "witness provided him with a lead pad, in tbe shape of tbe frog, for one of his feet; tbe pad being covered with pitch, to which tbe dirt would adhere, which, as the witness observes, “impedes the speed of a horse.” Tbe event proved that bis confidence was not misplaced, for Airship won tbe race. In tbe meanwhile plaintiff was to, and, we think did, lay heavier odds against Pat Bul-ger than other betters and bookmakers were giving, and thereby obtained more bets and made his profit. Wishart testifies that tbe consideration moving in bis direction, was merely plaintiff’s promise that at some future time and when assured of winning be would make a bet for bis (Wisbart’s) benefit. He further testifies that upon the evening of the day upon which Pat Bulger was beaten plaintiff called at bis boarding bouse, and, suggesting that Tarpy was entered for a race on tbe Suburban track to come off tbe next •lay, and being assured that be was likely to win, proposed that witness should dope him, or should allow plaintiff to give him a handful of lime, saying:
“We will take in at least $1,000, and I will cut the sheet with you [meaning that he would make a book and divide the profits].”
The witness testifies that he declined the proposition, the only reason he gives for having done so being that he felt pretty sure that, if he acted on it, he would he “ruled off.” He further testifies that plaintiff by way of argument said:
“There is no chance of getting "into trouble. We started Oapitano the other day, and Kirby pulled him and I divided with him.”
J. Edgcumbe (called by defendants) testified that he was engaged in 1905 and 1906 in racing a string of horses at the City Park race track; that he was introduced to plaintiff by Kirby D. Orr, who, as he thinks, worked for plaintiff at the new half mile track (at which it was proposed to have night racing, and which appears to have been sup-, pressed by the mayor); that Orr had Capita-no entered for a race at the Suburban track and told witness that he intended to “lay him up in the book” (i. e., “get him left at the post” and “split the sheet” with the bookmaker), and that he hired a boy who was working, about witness’ stable to ride the horse and carry out the scheme; that the boy rode Oapitano, who was left at the post; that Orr paid the boy $10, though the usual amount paid a jockey at the Oity Park race track, when a race is lost is $5, and at the Suburban track nothing; that witness was present at a meeting between plaintiff, who was keeping a book, and Orr on the Suburban track upon the day of and after the race in question, and saw them dividing the money, Orr being disappointed at receiving only $40; that he met plaintiff the next day, when plaintiff proposed that he (witness) should take his mare Annie Davis over to the Suburban track, where he (plaintiff) would do by her as he had done by Kirby Orr’s horse, a proposition which witness declined. He testified that plaintiff made a book on the race for which Pat Bulger was entered, and placed the odds (against him, as we understand it) at “the top price,” though the public thought that Pat Bulger would win, and that Pat. Bulger finished fourth, “out of the money”; that witness boarded in the same house with Wishart, and upon the evening of the day of the race in question admitted plaintiff, who called on Wishart; that wit *181 ness occupied a room next to that of Wishart and separated from it by a thin partition, with cracks in it, through which there was a door, and that he heard a great deal of the conversation that took place between Wishart and plaintiff, that they discussed the race, figured up some sheets, and, as witness thought, divided some money, Wishart saying (among other things):
“I told you that the horse wouldn’t be in the money. I told you to do what you could. You got a little scared. I told you you needn’t worry, and Pat wouldn’t be in the money.”
Witness also testified that -they talked about the race for which Tarpy was entered for the next day, and plaintiff said “they could get the money on him as they did on the other; [that] he would split the-sheets with him,” and that he (witness) thought that Wishart was in favor of it. He further testified that after plaintiff left Mrs. Wishart reproached her husband with trying to make their “boy a crook,” and said:
“There is one thing you promised me, and that is that you would let him be honest, but I see you are trying to make him crooked. You are not honest. You are so crooked you cannot lay in bed straight.”
The witness further testified that he communicated what he knew to the defendant Murphy, one of the judges of the City Park race track.
Guy Fisher, turf reporter for the St. Louis Star Chronicle, testified that he met plaintiff a few days after the latter had been ruled off the track, and that “he seemed to take it rather as a joke.” He said “he had paid nearly $200 a day to do business at the track, and he had done it.” Being asked what he understood by the statement so made, there was an objection by plaintiff’s counsel, sustained by the court. The witness, however, subsequently stated that the tone of plaintiff’s voice and his manner were “rather significant”; the meaning- of the witness apparently being that plaintiff conveyed the idea that, having paid nearly $200 a day for the privilege of doing business on the City Park race track, he had done the business according to his own methods, and to his own satisfaction. Without counting Wishart, four witnesses called for defendants testified that plaintiff’s general reputation is bad. Two witnesses called for plaintiff testified that he had always been honest in his dealings with them, and that they paid no attention to anything they heard to his detriment. An effort was made to show that plaintiff had no book on the race in which Pat Bulger ran.- We think it unsuccessful. It was admitted:
“That, if Mr. Orr were present and sworn as a witness, he would contradict every statement that has been made here with reference to any crooked dealings he may have had with Mr. William Rabb.”
Plaintiff, testifying in his own behalf, denied that he operated any book on the Pat Bulger race, and denied generally and specially the charge of fraudulent dealing imputed to him. He stated that he called on Wishart upon the evening of the race in question to take him a pair of shoes, and that after December' 21, 1905, he was out of money and made no books. Being askedr “Mr.- Rabb, when you were ruled off, did you take an appeal,” he answered, “No, sir; I was glad of it.” And he further testified upon the subject as follows:
“Q. If your honesty is so good, why did you not appeal from that ruling? A. To whom? I was tickled to death when they ruled me off. Q. You did not want to appeal? A. To whom? Q. Don’t the rules grant you the right to appeal? A. I don’t attend to them. Each official is hired by certain people, and they take a man and make a black eye out of him to give' him general notoriety. Q. Is Mr. Murphy your enemy? A. No, sir; never spoke to him in my life. A. And Mr. Trevelyan? A. No, sir. Q. Are the daily press your enemies? A. It looks that way.”
There was a verdict for defendants, which was made the judgment of the court, and plaintiff prosecutes this appeal.
*183 Opinion.
The damages here claimed are alleged to have been sustained by reason of the fact that the individuals named as defendants—
•“falsely accused petitioner of swindling and of entering- into a fraudulent conspiracy with one U. S. Wishart to cheat and swindle in the running of races at the said City Park race track, and that they gave out and published false and malicious accusations in the New Orleans Picayune, Times-Democrat, Daily States, Daily News, and City Item. The News and States belong to the same company, and the said papers are published by the respective corporations bearing their names, and they caused said .slanderous and libelous accusations to be published in the New York Herald, New York American, and St. Louis Globe Democrat, and other papers, by which your petitioner was published to the whole world as a cheat and swindler.”
There has been no attempt to prove that the individual defendants gave out or caused to be published anything about the plaintiff, or that they accused him of anything, or made known to any one the accusation (made by Edgcumbe) upon which the two judges founded their action.
This, taken in connection with the fact, for which we have his testimony, that he was •“tickled to death” when they ruled him off and acquiesced in the ruling, leaves plaintiff’s complaint quoad the defendants referred to entirely without support. Beyond that, we find no reason to doubt that he was so operating on the City Park race track as to bring himself voluntarily within the jurisdiction of the constituted authorities- of the Track and Turf Association, consisting of the judges, acting as a court of first instance, or as an accusing body with power to act, and an appellate tribunal, vested with authority to review the rulings of the judges. It is true that the judges acted without affording plaintiff an opportunity to be heard, but that was no more than is done every day .by regularly'established judicial tribunals in the issuance of preliminary writs of injunction ; and where, as may happen upon a race track, it becomes a question whether the
lambs of the public shall unfairly and irretrievably be shorn of their fleeces, or the shearer stayed in his work until the case can be inquired into, the propriety of the latter course seems reasonably apparent, the more so if the wielder of the shears has agreed to it in advance. One cannot be definitely expelled from an organization of which he is a member without being afforded an opportunity to be heard, because that would be to deprive him of a right without due process of law, nor can one be so expelled without being afforded the trial provided for by the rules of the association, because the right to such trial is secured by his contract of membership, as expressed in the rules. And, whilst the relations of a bookmaker to the proprietors of a race track differ from those which the members of an association bear to each other, nevertheless the bookmaker, incurring certain obligations, acquires certain correlative rights, and, though he may incur the obligation of submitting to the jurisdiction of the racing authorities with respect to the continuance of his operations on their tracks, that jurisdiction can, under no circumstance and under no rules, be so exercised as to deprive him without a hearing of his good name.
The weight of authority, however, sustains the proposition that an expelled member of a fraternal order, a mutual benefit association, an incorporated labor union, an unincorporated club, etc., must exhaust his remedy (provided it appears to be reasonably sufficient) within such organization, including the exercise of the right of appeal, before he can be heard in the courts. Supreme Lodge, etc., v. Raymond, 57 Kan. 647, 47 Pac. 533, 49 L. R. A. 379, note “e.” And we see no reason why a rule, at least as stringent should not be applied to'a bookmaker in his relation to the proprietor of a race track. It may be remarked, in this connection, that neither the publications complained of nor *185 the charter nor the rules of the American Turf Association, nor those of the City Part Jockey Club, have been brought up in the transcript, and we know no more about any of them than is contained in the testimony to which we have referred in the statement of the case. Included therein, however, is the wholly unquestioned statement of Murphy, to the effect that judges are authorized to discipline bookmakers and others, and that their action in plaintiff’s case was such as was customary, being tentative in its character and subject to review on appeal, and we have plaintiff’s admission that he was glad to accept it as final, which he was at liberty to do.
It seems probable to us from the fact that plaintiff is shown to have stated that he had paid nearly $200 per day for the privilege of doing business on the City Park race track, and from the absence of any serious effort on his part to fix liability upon the proprietors or their employés, that there were specific contract relations between him and the proprietors, pursuant to which, as well as to the authority and rules to which Murphy has testified, the judges felt authorized to proceed as they did. However that may be, if plaintiff thought the judges had erred, he should have demanded a hearing, either before them or before the appellate tribunal. But, instead of availing himself of either remedy, he publicly announced that he was “tickled to death” with their ruling, though he must have known in the nature of things that it was predicated upon some charge of misconduct prejudicial to honest racing, and in all probability he knew exactly what the charge was. Having turned his back upon the remedies afforded him in the forum of his selection, and acquiesced, and still acquiescing, in the judgment there pronounced, he could not be heard here to complain of that judgment. Nor is he complaining of it. His complaint is leveled at the reasons upon which the judgment was predicated, and upon the fact that those reasons were communicated to the newspapers, and by them published. He has not, however, shown that the judges, or other individual defendants, communicated those reasons to the press, and the reasons themselves are so entirely relevant to the judgment as to be merged in it; so that plaintiff, consenting to the one, necessarily consents to the other. He can no more consent to the judgment and object to the reasons than he could approve his coat and object to the material of which it is made, the color, and the workmanship. The next question suggested is whether the newspaper owners could be held liable in damages for publishing, in connection with the ruling which has so pleased the plaintiff, the reasons, or charges, upon which the ruling was predicated. This question, we think, should be answered in the negative. The matter of-fraudulent racing is one which concerns the public, in which the proprietors of race tracks, for the protection of their patrons and themselves, are in duty bound to keep the public posted as to their action in any given case; and with respect to which the plaintiff, in engaging in business as a bookmaker on a public race track, consented that his conduct should be investigated and judged, in the interest, and for the benefit, of the public. The question presented for the racing judges was therefore one quite as mueh of public, as of private, concern, and the public were as much entitled to be informed of what was going on as the plaintiff himself, or the proprietors of the race track. It will be observed that it is not charged in the petition that the newspapers assumed the truth of the accusations published by them. The allegations are that certain named individuals “falsely accused * * * petitioner,” and that they “gave out and published false and malicious accusations” in the newspapers. If it were not, therefore, that the petition is silent as to the fact that the accusa *187 tions were made before a court of competent jurisdiction, it would disclose no cause of action as to the newspaper owners. Tlie rule applicable to this phase of tbe case is stated in Billet v. Publishing Co., 107 La. 761, 32 South. 21, 58 L. R. A. 62, as follows:
“The right to publish reports of ex parte proceedings and preliminary examinations and the like does not seem to be fully conceded by the law. The weight of authority is in favor of extending the privilege to reports of arrest or information gained from papers on file, so long as such reports do not assume the guilt of the accused, and are not otherwise defamatory.” Newell on Defamation, Slander and Libel, p. 549.
“So it has been held that a newspaper may report the fact that a person has been arrested and held for examination on a particular charge, but that it has no right to go beyond this and assume the guilt of the person charged. Tresca v. Maddox, 11 La. Ann. 206, 66 Am. Dec. 198; Usher v. Severence, 20 Me. 9, 37 Am. Dec. 33.”
We may add that a newspaper may publish the action of a court or other public or quasi public body in any given case, whatever that action may be, provided the publication be not made with malicious intent.
In Wallis v. Bazet, 34 La. Ann. 131, it appears that defendant published in a newspaper of which he was the proprietor the proceeding of the town council, and was thereupon sued for damages. The court said:
“This was an open meeting of the corporate authorities of the town who are charged with the management of its affairs, whose right and duty it is to examine into and discuss all matters touching the disbursements, expenditures, etc., of the funds over which they have a guardianship. * * * For a newspaper to give the substance of such proceedings by publication in the locality in which the paper is published and whose citizens are interested in the matter cannot be regarded by us as being in itself malicious and libelous.”
Applying the view thus expressed to the case before us, it may be said that there are probably more people interested in the proceedings of the judges of the races sitting to hear charges of fraudulent racing than in the proceedings of the town council of Hou-ma. Whether the judges sit in open session for .such purpose we are not informed, nor does the course pursued in that respect alter the fact that the public have an interest in the proceedings. We see no reason, therefore, why the rule applied to the proceedings of a town council should not be applied to the proceedings of a court of racing judges, sitting to hear charges of fraudulent racing. The defendant newspaper owners, however, admitting the publication of the accusations in question, plead their verity by way of justification, and we are of opinion that they have established the defense so set up. Wis-hart’s testimony of itself proves nothing except the character of the witness. But considered in connection with that of Edgcumbe and other witnesses, and with circumstances which do not lie, it serves in some measure to: explain. We know, for instance, the modus operandi by which an honest horse and an honest jockey can be made by a dishonest trainer to lose a race which they ought to win.
Judgment affirmed.