John K. BORG, Appellant,

v.

Louis A. BOAS and The News-Review Publishing Company, Inc., a Corporation, Appellee.

John K. BORG, Appellant,

v.

The TRIBUNE PUBLISHING COMPANY, a Corporation, Appellee.

Nos. 14469, 14470.

United States Court of Appeals Ninth Circuit.

Jan. 30, 1956.

Murray Estes, Moscow, Idaho, J. P. Tonkoff, Tonkoff, Holst & Hopp, Yakima, Wash., for appellant.

Maurice H. Greene, Boise, Idaho, V. R. Clements, Reed Clements, Clements & Clements, Lewiston, Idaho, for appellees.

Before STEPHENS, FEE and CHAMBERS, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

These are appeals from judgments entered on directed verdicts for respective defendants in two actions for libel consolidated for trial in the District Court. The following facts are gleaned from the record.

Plaintiff was a Justice of the Peace in Latah County, Idaho. Murray Estes, who is a lawyer and one of the attorneys for plaintiff in the lower court and on this appeal, was accused by complaint with having assaulted one Shoup with a deadly weapon. This charge was dismissed by Borg, the plaintiff, as Justice of the Peace. Subsequently, Murray Estes permitted the dismissal to be set aside, and thereafter pleaded guilty before another judicial officer to the crime of battery based upon the same incidents. Later, a public meeting was held, over which a professor of the University of Idaho presided. Idaho State District Judge McQuade was present, Captain Thomas, of the United States Navy in charge of the naval R. O. T. C. unit attached to the University of Idaho, spoke with the purpose of convincing the authorities that the whole matter should be scrutinized by a grand jury. The newspapers printed accounts of the public meeting, which were shown to be complete and accurate. The actions are based upon the newspaper reports of the remarks of Captain Thomas. One of the articles of which complaint is made is set out in the margin.[1] The other raises similar problems.

[1.] "Good Government Association Formed At Public Meeting Called At School

"A faction of the Moscow population, numbering some 175 persons, not satisfied with recent actions, which brought an abrupt conclusion of the legal cases involving a Moscow attorney and a University of Idaho student, went on record at a public gathering last night 'requesting a grand jury' call to clear away what the group called a 'miscarriage of justice.'

"The gathering at Moscow high school last night was called in protest to the actions growing out of incidents at the Perch, a campus restaurant, last December 14, involving Richard Shoup, university student, and Murray Estes, local attorney.

"This morning, District Judge McQuade, upon whose order rests a call of a grand jury, said he would recommend to Latah county Prosecuting Attorney Melvin Alsager that a 'full and complete investigation be conducted in the Estes-Shoup cases even to the point of hiring a qualified investigator.' McQuade said he would recommend approval to the county commissioners the use of the prosecutor's contingency fund for financing such an investigation.

" 'Following such an investigation, should facts warrant the filing of informations in the cases,' Judge McQuade said he would then consider 'a future course of action, whether it be through the local judicial level or through call of a grand jury.'

Plaintiff presented the case as if he were required to prove that he had made an honest mistake in administration. The articles showed on their face that Captain Thomas had an interest because Shoup was a member of his command

"Judge McQuade, in attendance at last night's session and frequently called upon to answer questions during the so-called 'free forum,' repeated his earlier remarks that 'I will not call a grand jury if the basis of the call is on rumor alone, because I won't see innocent people hurt.'

"Lengthy Review

"Last night's session opened (following selection of Dean D. S. Jeffers of the university Forestry School as temporary chairman) with a detailed review of the Estes-Shoup cases by Capt. Thomas C. Thomas, commander of the university naval ROTC unit, of which Shoup was a member.

"Captain Thomas presented his interpretation of the incidents which began at a party at the Idaho Ad club, at which Estes was present, and continued through the alleged altercation at the Perch and subsequent legal maneuvers which concluded last week with a plea of guilty to a battery charge by Estes, and dismissal of charges by Estes against Shoup charging an attempt to compound a felony.

"Thomas reported certain facts and incidents which have never before been told publicly and were not a part of any court record * * * they, if they are true, could change matters considerably.

"Only One Side

"When asked by Mrs. Helen Howard 'if Captain Thomas' facts are true, would you accept that as sufficient evidence for calling of a grand jury?', Judge McQuade answered: 'If they are all true and there are no explanatory facts which neutralize them, it would be proper to bring in a grand jury. But the captain has brought in only one side of this case.'

"McQuade, after complimenting Captain Thomas for his detailed review and its presentation, declared the navy man had put forth only facts which were favorable to his side.

"Last night's meeting came about as a result of an earlier refusal by Judge McQuade to call a grand jury to investigate possible evidences of injustices during the four-month course of the Estes-Shoup cases.

"During the course of the three-hour session last night, motions from the floor resulted in the following actions:

"Four Steps

"1. Formation of an organization to be known as the provisional Latah County Good Government association.

"2. Authorization of the temporary chairman to appoint a committee to poll Latah county residents on the question of whether they want a grand jury impaneled.

"3. Selection of a committee, made up of Jeffers, Malcolm Neely, Carman Mell, Moscow; William McCreerey, Kendrick, and J. O. Broyles, Potlatch, to put forward a slate of officers, draw up an organizational plan and arrange for future meetings.

"4. Requested the temporary chairman to inform Judge McQuade that it was the desire of the group that a grand jury be called.

"It was upon the issuance of the statement by Chairman Jeffers to McQuade revealing the desire of the group that Judge McQuade repeated his stand that he would 'not call a grand jury on rumor alone.'

"Both sides of the issue were presented at the session. The Rev. W. W. Prall, speaking as a 'private citizen,' urged more investigation. 'Let's find out first, what a grand jury can do. To be perfectly frank, all I have heard is rumor and I doubt if you can investigate a rumor.'

"He also explained that he 'did not believe that at the moment there is anything on which the judge could impanel a grand jury.'

"Needs Evidence

"To which Judge McQuade replied: 'All the petitions in the world won't find a man guilty. The only thing that means anything is evidence. I'm not going to call the grand jury. I'm not going to take a chance of having people hurt.'

"In his detailed review of the cases, Captain Thomas said that shortly after the party at the Idaho Ad club at which both Estes and J. M. O'Donnell, then county prosecuting attorney, were present, Estes went to the Perch and accosted Shoup. The proprietor of the cafe intervened and police were summoned.

"The first police officer who arrived, Captain Thomas said, allowed Estes to depart 'and did not take his pistol from him.' The second officer, he said, arrived and took Shoup to jail, where he was questioned 'for quite a considerable time.'

" 'It was then thoroughly established,' Thomas said, 'that he was completely innocent, and later Estes admitted that it had been a case of mistaken identity.'

"After several instances where Shoup

791

and that he was making his statement at a public meeting called for the purpose of obtaining a grand jury investigation and that the District Judge, who had power to call a grand jury, was present at the meeting and refused to summon

had been dissuaded from filing any charges against Estes, a charge was filed soon after Melvin Alsager took office as prosecuting attorney, some four weeks after the incident, Thomas said.

"Thomas then made reference to legal maneuvers in which a hearing was set for January 15 at 9 a. m. At 8 a. m. that day, Thomas explained, Alsager notified Judge John K. Borg that he would be ready at 9. Alsager and his witnesses were present at police court, normally the place where such hearings are held. But the judge and Estes, Thomas said, had gone to the county courthouse to hear the case.

"Ridiculous Situation

" 'This was a ridiculous situation,' said Captain Thomas. A motion for dismissal was made and it was dismissed. 'If this had been an honest mistake, it could have been easily rectified by lifting a telephone and telling the prosecutor to bring his witness and come on over.'

"A second felony charge was filed a few days later but this also was dismissed, Captain Thomas said, on the ground that there was insufficient evidence upon which to bind Estes over.

"In the meantime, Captain Thomas explained, the boy (Shoup) was undergoing a strain which was evidenced in bad grades and a possibility he would be expelled from the naval ROTC.

" 'At the end of January,' Thomas continued, 'the individual who caused the trouble was scott free and the victim was subject to dismissal from the navy and in danger of losing his chance to become a naval officer. It was simply not right.'

"Later Shoup's parents came from McKeesport, Pa., and it was agreed then that a simple battery action would be brought against Estes. This third charge was filed soon after Easter, Thomas added.

"Captain Thomas then charged that Probate Judge Lloyd Martinson had attempted to hold a 'quiet, closed trial.' Alsager was told to bring in the boy and no other witnesses, Thomas said. The prosecutor at first agreed and 'then when he realized what was happening, he properly refused to go along with it.'

"The next day a charge was filed against Shoup alleging that he had attempted to compound a felony. Thomas said that this charge could not have stood up in court.

"Cites Statement

"On April 23, Captain Thomas said McQuade held a conference in which he dissuaded Thomas from allowing his secretary to take notes. He went on that the following day an article appeared in the Daily Idahonian which quoted Judge McQuade as saying that an agreement had been reached by all principals in the case and that there was no justification for calling a grand jury.

"Thomas said the story quoted McQuade as saying that attorneys for both sides objected to the expense of a grand jury except as a last resort. Thomas said that was erroneous, that no such agreement was reached.

"On May 5, Thomas continued, there was another effort to hold a quiet trial, but that Alsager again refused, saying a public trial had been set for May 6 and that was when he intended to have it.

"Estes appeared privately before the judge, pleading guilty to the charge of battery and was fined $100. After Estes' conviction, the charge against Shoup was dismissed.

" 'At long last,' Captain Thomas said, 'we had Shoup freed.'

"But these things, Thomas said, 'continue to disturb me':

" '1. Failure of the police to arrest Estes.

" '2. Failure of the police to take the pistol from Estes.

" '3. The extraordinary circumstances in which the first felony was dismissed.

" '4. Circumstances of the dismissal of the second charge against Estes.

" '5. The reason for the steps which McQuade took to avoid calling a grand jury.'

" 'What to do about it? There has been no change in the local set up since December. The same faces hold office. The same thing could take place and again we'd go through this same rigamarole. There is no way to get justice or to correct the faults in the administration of justice * * * without a grand jury,' Thomas concluded.

"It was then that Judge McQuade took the floor to offer rebuttal to the statements made by Captain Thomas and to present his reasons for refusing to call a grand jury.

"Others Speak

"Following Judge McQuade's dissertation, Chairman Jeffers declared a 'free forum' and limited each speaker to three minutes.

"Mrs. Bernice Brigham, Genesee, declared 'this is not the only case of mis-

that body. It was also reported that the District Judge thereafter had taken steps as a result of the meeting to make a thorough investigation to determine whether such a call was justified. Defendants confined their efforts to testimony which might tend to create the inference that the dismissal by Borg was planned and to proof that the speeches at the meeting had been correctly reported. There was no evidence from which it might be inferred that malice upon the part of Captain Thomas or any of the defendant newspapers existed or that publication was not warranted by the occasion.

The cause was tried before a jury. Before trial, plaintiff elected "to dismiss the defendant T. C. Thomas from action 1951 [numbered 14,470 on appeal] which is designated as the Tribune action and hold him in action No. 1950 [numbered 14,469 on appeal] in which the defend-ants are Thomas and the News-Review and Louis A. Boas." The latter action "as far as T. C. Thomas is concerned" was dismissed at the conclusion of plaintiff's case. No appeal is taken from that dismissal. When both sides had rested, the remaining defendants, respectively, moved for a directed verdict in favor of each. The court directed the jury to return a verdict against plaintiff in each case.

■ The truth was in issue, and proof was submitted as to that defense by both sides. But it did not suffice to show that the speeches were accurately reported, although that is a feature of great importance in some aspects of the case. The truth of whatever charges were made must have been established by defendants for them to prevail on the plea of truth. Testimony as to this feature was submitted by both sides. This created an issue of fact for the

carriage of justice here' and added "it is only an indication of the type of justice Latah county has had for a long time.'

"Dr. R. E. Hosack. another faculty member, said he had been 'disturbed by a feeling of uncertainty on the part of Moscow residents over the way local justice has been handled.'

" 'I am also disturbed when a judge throws cold water in the face of the ancient and honorable institution of the grand jury. I think a grand jury would clear the air.'

"Clifford I. Dobler, law instructor, said, 'I don't teach about grand juries, but last week I got hold of a book called the Idaho Code. I found that 16 grand jurors get $4 a day for every day they meet plus 15 cents a mile traveling money.' Thus, he said, a grand jury 'would not be so expensive as Judge McQuade had intimated.' And, he added, 'the only people who could be injured are the guilty parties.'

"McQuade corrected Dobler by stating that grand jurors now get $6 daily plus 25 cents mileage, which would amount to about $96 daily while in session, in addition to costs necessary to subpoena witnesses.

"Cites Example

"McQuade made reference to a recent call to southern Idaho where he had tried grand juries indictments. In Bingham county, he said, seven men were indict-ed and not one convicted. But, he said, that in order to meet their legal expenses, they had all mortgaged their homes, sold their furnishings and cars, borrowed on life insurance and from friends and relatives.

" 'That's what I mean when I say innocent people can be hurt.'

"Among the other brief comments from the floor was that made by Alsager who said: 'My difficulty with the Estes case has been mostly with the lower court judges. They seem to be cooperating with the defendant more than with me. I don't mean they should side with me, but they should help me get a case to the right court at the right time.'

"This morning Mrs. R. E. Hosack gave this statement to the Idahonian:

" 'As president of the Moscow Council of Church Women, I wish to make it clear that the reports in the newspaper associating the Council, in my name, with the preliminary arrangements for the public meeting held in the high school Tuesday evening to discuss the administration of justice in Latah county, were erroneous and misleading. The Moscow Council of Church Women was in no way associated with the arrangements for this or any other meeting for this purpose. Any connection which I have had with this matter has been purely in the capacity of a private citizen.' " Idahonian—:—Moscow, Wednesday, May 13, 1953.

jury. Therefore, a directed verdict would not have been possible based upon this issue. But, if the occasion were privileged and plaintiff produced no proof of abuse of the privilege, the directed verdicts were proper. This question we will now examine.

The whole proceedings were directed toward this subject matter of legal administration. There was no attempt to attack any person or persons except as they were concerned with law enforcement and a particular series of cases. The attempt was by force of public opinion to induce Judge McQuade to impanel a grand jury. There was no attempt to indict Borg, but to have a grand jury investigate the Shoup-Estes controversy. Before this meeting, it appears from the evidence petitions were filed in the office of the County Auditor, praying the authorities to call a grand jury following a discussion at "more or less of a public meeting," wherein the advisability of such action was discussed. Furthermore, Thomas and the prosecuting attorney conferred often during this time. As the articles themselves show, meetings of Thomas and Shoup were held with Judge McQuade in an effort to get him to call a grand jury. At the meeting, it is reported Thomas charged that McQuade had held a conference in reference to a grand jury, where Thomas was dissuaded from having his secretary take notes, and the Judge thereafter announced "an agreement had been reached by all principals in the case and that there was no justification for calling a grand jury." According to the report, Judge McQuade reiterated his reasons for not calling a grand jury, and denied the other charges.

■ The evidence indicates no major controversy over the facts which the speaker related. The chief remark of which complaint is made is the phrase: "If this had been an honest mistake * * *." This was an opinion of Captain Thomas, expressed in connection with the facts he had related of the official acts of plaintiff. Under the circumstances, whatever was said was fair comment by Thomas. The sincerity of the criticism is undoubted and has not been challenged. It was delivered with an honest purpose. It appears as if the facts related by Thomas are subject to a possible interpretation such as he gave them.

■ Since plaintiff was a holder of public office, his official conduct was the subject of fair comment even though the words used were extremely harsh.

Plaintiff was correct when he conceded that Captain Thomas is not liable by permitting a dismissal of the cause as to him. However, although it be found that Captain Thomas, by his personal interest and the public interest he represented at the meeting, was absolutely privileged in his communication to Judge McQuade as a party to a judicial proceeding, it does not follow that the newspapers are similarly shielded. The newspapers must rely upon a privilege of their own. It should be noted that the words were spoken and reported only as to the conduct of a public official and as to conduct in office. The words were not spoken of and were not reported as having relation to Borg as a person. The references are all to his official capacity. The charges of improper administration did not relate to Judge Borg alone, but to police officers and other judges and lawyers.

■■ There is a limitation upon the conditional privilege to speak or print matters concerning conduct of a public officer. There must not be an attack which goes beyond the public concern and deals with the private character of the officer. The imputation of dishonesty to a judge might well be of this class. If the utterance be taken in its context, it does not appear libelous. But the imputation of a corrupt motive is often treated as a statement of fact. The courts which adopt this view require the defendant to bear the burden of proving the defense of truth of the assertion. Some courts take the view that even false statements of fact are privileged as to public officers. Unquestionably, this

doctrine is broad enough to cover an imputation of dishonesty of motivation. But it is not apparent that the Idaho courts have spoken on this subject. Unless this Court is required by the situation, we should not speculate upon what these tribunals would decide if confronted by these problems. We treat the utterance as if it were defamatory and as if there were no privilege to make false statements of fact solely on the ground that these were made with reference to a public official.

Nor will the doctrine of fair comment assist. The papers did not assume to make any comment. All they purported to do was to present a substantially complete and accurate report of the proceedings.

There is a general doctrine that what is said at a public meeting, at which any person of the community or communities involved might have attended and heard and seen for himself, is conditionally privileged for publication. This rule might protect the newspapers here involved. This principle is broadly extended to many meetings and types of assemblies. The Idaho legislature has embodied this privilege in a statute which provides a defense to a charge of criminal libel. Idaho Code, § 18–4807. The Idaho Supreme Court has apparently imported the rule into civil litigation, Gough v. Tribune-Journal, 73 Idaho 173, 178, 249 P.2d 192, besides broadly indicating the type of public gatherings a "proper" factual report of which might fall within the statute. State v. Sheridan, 14 Idaho 222, 93 P. 656, 15 L.R.A., N.S., 497. But this doctrine is not expressly relied upon.

This public gathering was analogous to the New England town meeting. A well reputed person of standing in the community was moderator. Everyone interested had the opportunity to express an opinion. The people of Idaho have reserved to themselves the right of assembly by a clause in the state Constitution.[2]

The public press performs its most valuable function in the interest of the people at large by correctly reporting proceedings which relate to the administration of law. It is vital in a country which relies upon representative officials that the public be so informed. Otherwise, there is no guard against maladministration. In this case, there was a report of what was said at a public meeting in an attempt to persuade a District Judge, who had the power to call a grand jury, that such body should be permitted to examine the matter. The judge took judicial action by refusing. It was reported that the judge took further judicial action by directing the District Attorney to make a thorough investigation in order that he could reconsider.

It is hornbook learning that the actions and utterances in judicial proceedings so far as the actual participants therein are concerned and preliminary steps leading to judicial action of an official nature have been given absolute privilege.[3] Of particular interest are proceedings leading up to prosecutions or attempted prosecutions for crime. The common law placed a veil of secrecy about the proceedings of a grand jury, so that all persons might freely disclose their suspicions and deductions without the danger of a libel suit as a result of an attempt at law enforcement. But a written charge or information filed with the prosecutor or the court is not libelous although proved to be false and unfounded. Furthermore, the information given to a prosecutor by a private person for the purpose of initiating a prosecution is protected by the same cloak of immunity and cannot be used as a basis for an action for defamation. By analogy to reports of proceedings of a

---

2. Idaho Constitution, art. 1, § 10: "The people shall have the right to assemble in a peaceable manner, to consult for their common good; to instruct their representatives, and to petition the legislature for the redress of grievances."

3. Restatement of the Law of Torts, §§ 585, 586, 587, 588, 589.

judicial nature and complaints in an attempt to obtain official action in the nature of a prosecution, we hold there was a conditional privilege for any of the newspapers here involved to publish with accuracy the proceedings of this assembly attempting to induce a judge who possessed the power to call a grand jury. Since plaintiff made no attempt to prove and the evidence did not show any abuse of this conditional privilege, there was no ground to sustain a judgment and the trial court was correct in directing a verdict.

 The determination of this issue is conclusive of the case. This Court has examined the other claimed errors and finds nothing to affect the result. An objection was sustained to an offer of prior and subsequent publications relating to the events recounted at the public meeting. It is not claimed these themselves were libelous. It cannot be contended these show malice. Plaintiff offered testimony allegedly to show the impact of the article on plaintiff and all persons who read it, which was rejected. Plaintiff had not pleaded special damage, and the evidence tendered was cumulative. The tendered evidence as to procedure in a preliminary hearing, when the prosecuting attorney and complaining witness fail to appear, was clearly immaterial under the circumstances of the case. The court prevented an attempt to prove an alleged impeaching statement where no foundation had been laid. The ruling was accurate. If all of these items had been received in evidence, the ruling of the court in directing the verdict would still have been entirely correct.

 Severe animadversions must be placed upon the attempt of counsel in this Court, one of whom is Murray Estes, whose personal and professional conduct was involved to a certain extent in the articles, in the brief to impugn the demeanor of the trial judge of the District Court. It has often been said the federal judge presiding at a trial is not an automaton. He has a right, if it is necessary to prevent injustice, to ex-

press his opinions on the facts themselves to the jury, under proper safeguards. The trial judge took a firm position on the law eventually against plaintiff. In several instances, he ruled promptly and firmly and at times did not listen to further arguments or authorities. Perhaps the judge conceived he already knew the law on the subject. On one occasion where counsel attempted to argue after the ruling, the court cut him off with a tart rejoinder, which counsel did not care for. The record shows the remarks of the court were superinduced by counsel themselves. In any event, the trial court was right.

*Affirmed.*