Ace N. WRIGHT, Jr., Appellant,

v.

GROVE SUN NEWSPAPER COMPANY, INC., and State of Oklahoma ex rel. Jon Douthitt, in his individual capacity, Appellee.

No. 77169.

Supreme Court of Oklahoma.

April 12, 1994.

Carl Hughes, Joe White, Jr., Leo Winters, II, Hughes, White, Adams & Grant, Oklahoma City, for appellant.

Michael Minnis, David McCullough, Michael Minnis & Associates, P.C., Oklahoma City, for appellee.

OPALA, Justice.

The issues presented on certiorari are (1) Was the republication by Grove Sun Newspaper Company, Inc. [Grove Sun, defendant or newspaper] of material, released by the District Attorney of Delaware County [district attorney or prosecutor] at a news conference called by his office and held at the courthouse, privileged and hence not actionable in a libel claim? and (2) If the material was privileged, could Ace N. Wright, Jr. [Wright or plaintiff] maintain an action for intentional infliction of emotional distress? We answer the first question in the affirmative and the second in the negative. We conclude today that (a) the district attorney's news conference *was* an *official* function of his office and represents a *transaction/occasion* to which the common-law *fair report privilege will attach;* (b) the references to

Wright in the articles published by Grove Sun were *accurate republications* from materials released by the district attorney at the news conference and bereft of any judgmental newspaper gloss; (c) under circumstances shown by this record the *fair report privilege*[1] affords Grove Sun a *complete defense* to Wright's libel claims; and (d) the district court's order dismissing Wright's tort claims against Grove Sun must be affirmed.

## I

### THE ANATOMY OF LITIGATION

On May 11, 1990 the district attorney held a news conference at the courthouse in Jay, the county seat of Delaware County, *open to the public and the press.* At this event the district attorney discussed a drug investigation previously conducted by his office in Delaware County. With his comments concerning the termination of this investigation, the district attorney distributed to those present an affidavit attesting to the authenticity of a transcript [attached to the affidavit] of a conversation between two undercover narcotic agents who had participated in the probe. Grove Sun published articles in two newspapers[2] in Delaware County which included a *verbatim* transcript of the conversation between the two narcotic agents.[3] It is in this transcript that a reference was made to Wright, which he characterized as libelous. Grove Sun *did not embellish upon,* make any comments regarding, *or take editorial license with, the contents* of the affidavit furnished by the district attorney. The newspaper asserted below that the material published was a fair and true report of the news conference and was hence privileged.[4]

Wright filed suit in the Delaware County District Court pressing two causes of action for libel and, as *another* theory of liability, the intentional infliction of emotional distress. He also advanced a claim against the State of Oklahoma *ex rel.* Jon Douthitt. The

1. The common-law *fair report privilege* affords a *qualified or conditional privilege* to the media when they republish defamatory material in an account of a public or official proceeding. While the *fair report privilege* does not provide the media *absolute immunity* for their acts, it is a *defense* to or *exemption* from liability. *Privilege* arises only upon *identifiable occasions*—e.g., judicial proceedings, legislative sessions, administrative hearings, *or official news conferences. See* RESTATEMENT (SECOND) OF TORTS, ch. 25, Topic 2, Title B, Introductory Note; *see also, Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586, 588–89 (1963); *Phoenix Newspapers v. Choisser,* 82 Ariz. 271, 312 P.2d 150 (1957); *Fortney v. Stephan,* 237 Mich. 603, 213 N.W. 172, 174 (1927); *Garby v. Bennett,* 166 N.Y. 392, 59 N.E. 1117 (App. 1912). *Privilege* is distinguishable from *immunity;* the latter is based chiefly upon a person's *status*—e.g., judicial officers, legislators, attorneys during the course of litigation, prosecutors, witnesses in judicial proceedings. The scope of the privilege (or immunity) to be applied is determined by either a *transactional* or *relational* analysis. While this offending courthouse event would give the newspaper but an opportunity for interposing qualified *privilege,* it would have extended a qualified *immunity* to the prosecutor because of his status. *See Buckley v. Fitzsimmons,* — U.S. —, ——————, 113 S.Ct. 2606, 2615–16, 125 L.Ed.2d 209 (1993). For further discussion of the distinctions between *absolute* and *qualified* privilege/immunity, see *Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988); *Buckley,* — U.S. at ——— ———, 113 S.Ct. *supra* at 2612–18; and RESTATEMENT (SECOND) OF TORTS § 611 comments (a) and (b), § 890 comment (a), Chapter 25 introductory note, and Chapter 45A introductory note. The *underpinning* of the qualified *privilege of fair report* is derived from an *agency concept.* It rests upon the notion that since the activity covered by the press was open to the public, the media functioned as a mere substitute for the public eye and ear—i.e., the public's agent. *See* Dorothy A. Bowles, 11 COM. & L., No. 1, pg. 3 (1989); W. Page Keeton, PROSSER AND KEETON ON THE LAW OF TORTS (FIFTH), (1984), pp. 836–38. For historical antecedents of the privilege see *infra* note 26.

2. The first alleged defamation occurred in an article published on May 16, 1990 in *The Delaware County Journal* and the second appeared in *The Grove Sun* on May 20, 1990. Both newspapers were then owned by the defendant.

3. *See* appellant's brief in chief, pp. 1, 2, and 4; appellee's answer brief, pp. 1, 23–26. *Admissions* in an appellate brief may be used as a *supplement* to the appellate record. *Kwikset/Emhart v. Mayberry,* Okl., 800 P.2d 239, 240 n. 1 (1990); *Reeves v. Agee,* Okl., 769 P.2d 745, 754 (1989); *Womack v. City of Oklahoma City,* Okl., 726 P.2d 1178, 1181 n. 8 (1986).

4. Grove Sun maintained that its *claimed privilege* rests upon the provisions of 12 O.S.1991 § 1443.1 or on the constitutional *neutral reportage privilege* recognized by the U.S. Court of Appeals for the Second Circuit. For explanation of the difference between the two principles, *see infra* notes 16 and 29.

district court ordered the claim against the State dismissed for plaintiff's failure to comply with the Oklahoma Governmental Tort Claims Act, 51 O.S.1991 §§ 151 *et seq.* This ruling went unchallenged by appeal. The district court then ordered all remaining claims dismissed.[5] The court of appeals affirmed the *nisi prius* decision, holding that the *neutral reportage privilege*[6] provided Grove Sun a complete defense to Wright's claims.[7] We granted certiorari and now affirm the dismissal order.

## II

### THE ACCURATE AND TRUE REPORTING OF MATERIAL DISSEMINATED ON OFFICIAL PUBLIC OCCASIONS IS CRITICAL TO THE MAINTENANCE OF OUR DEMOCRATIC INSTITUTIONS OF GOVERNMENT.

At issue here is the need in a free, self-governing society for dissemination of information of fundamental importance to the people. Without accurate media coverage of *official public events*, it is highly doubtful that the general public would be able to make informed decisions and participate intelligently in their governance; nor would representatives of government be able to perform their assigned tasks effectively.[8] It is hence *against the backdrop* of *public interest* in information concerning public and official activities of government that this case juxtaposes the interest of an *individual* in protecting his reputation from harm. The tension between the right of the press to disseminate information to the public and the law of defamation is not new. It is mirrored in the eighteenth-century common law of England,[9] which developed the *fair report privilege*—the doctrine we invoke today for application to this case. Without this privilege the media would be compelled to engage in *acts of self-censorship*[10] whenever repub-

---

5. In its order of February 27, 1991 the district court did not give any explanation for sustaining Grove Sun's dismissal quest.

6. For a discussion of the *neutral reportage privilege*, see *infra* note 29.

7. The Court of Appeals need not have rested its opinion on Grove Sun's *constitutional* neutral reportage privilege. The republication was *well within* the protection of the common law *fair report privilege*. There was hence no occasion for reaching the constitutional question. *See* our discussion of the "prudential bar" of restraint, *infra* note 31, which counsels against deciding constitutional issues in advance of strict necessity.

8. Justice White in *Cox Broadcasting Corporation v. Cohn*, 420 U.S. 469, 491–92, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975), stated for the Court:

"[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally."

9. This conflict provided the legal culture for the growth of the common-law *fair report privilege*, which is of fairly recent origin in English jurisprudence. It came into existence in the late eighteenth century. Before then reporting about Parliament was considered "a reflection on government", deemed seditious libel, and punished. As the public learned to read, Parliament found it more difficult to control the dissemination of information by the press. Finally, by 1771, the House of Commons grudgingly withdrew from citing newspapers for *reporting* speeches and thereafter confined its contempt power to charges for *misrepresenting* speeches or for libelous attacks on the reputations of individual members of Parliament. In the early nineteenth century English courts were unwilling to apply the *fair report privilege* to occasions *other* than judicial or Parliamentary proceedings. The privilege was enlarged *legislatively* in 1881 by Parliament's enactment of the Newspaper Libel and Registration Act which extended a qualified privilege to all meetings *called for a lawful purpose* and *open to the public* if *republication of the material was for public benefit.* RESTATEMENT (SECOND) OF TORTS § 611 reflects the *status* of the common-law fair report privilege after the enactment of this legislation. For a discussion of the historical antecedents of the *fair report privilege*, see Fredrick Seaton Siebert, FREEDOM OF THE PRESS IN ENGLAND 1476–1776 (1965).

10. *Censorship* is "any examination of thought or expression in order to prevent publication of *objectionable* material." *See Farmers Educational & Coop. Union v. WDAY, Inc.*, 360 U.S. 525, 527, 79 S.Ct. 1302, 1304, 3 L.Ed.2d 1407 (1959).

lishing information released by governmental officials to the public at *official* functions. The damage by reputational harm which goes unredressed because of the *fair report privilege* defense must be subordinated to the larger societal interests in the values which the privilege protects.

## III

### EXCEPT AS ALTERED BY OUR CONSTITUTION AND STATUTES, THE COMMON LAW REMAINS IN FULL FORCE.

■ By the mandate of 12. O.S.1991 § 2 [11] *the common law remains in full force unless a statute explicitly provides to the contrary.* The common law's legislative abrogation may not be effected by mere *implication.* [12] It must be clearly and plainly expressed. [13] A presumption favors the preservation of common-law rights. [14] In this State's legal system the common law forms "a dynamic and growing" body of rules that changes with the conditions of society. [15]

■ The provisions of 12 O.S.1991 § 1443.-1 [16] embody the *statutory privilege* that affords to the media a complete defense to libel. While in some respects the statutory privilege overlaps the common-law *fair report privilege*, it does *not* provide the media with identical protection. The scope of the *fair report privilege* is *broader than* the terms of *the statute;* since the latter does not abrogate the other, [17] the former remains a viable defense to libel. [18]

---

In *WDAY* the Court addressed, in the context of the Federal Communications Act, the question whether a radio station should be extended a privilege from liability for airing the speeches of political candidates when the speech of one of the candidates was libelous of the other candidates. Extending a privilege to the radio station, the court observed: "Quite possibly, if a station were held responsible for the broadcast of libelous material, all remarks even faintly objectionable would be excluded out of an excess of caution." *Id.* 360 U.S. at 530–32, 79 S.Ct. at 1306. It would not be in the public interest to require the media, before printing the publicly disseminated material, to test the truth or falsity of records and statements made available to the community by *public officials* in order to avoid the costs and time of defending libel suits. To do so would invite "timidity and self-censorship" and would have a chilling effect on the press, ultimately leading to the suppression of information necessary to the vitality of our democratic institutions. *See Cox, supra* note 8, 420 U.S. at 494–96, 95 S.Ct. at 1046. *See also,* Kathryn Dix Sowle, Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report, 54 N.Y.U.L.Rev. 469, 476 (1979).

11. 12 O.S.1991 § 2. Its relevant terms provide:
"The common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma...."

12. *Tate v. Browning–Ferris, Inc.,* Okl., 833 P.2d 1218, 1225–26 (1992); *Silver v. Slusher,* Okl., 770 P.2d 878, 884 (1989); *Ricks Exploration v. Okl. Water Resources Bd.,* Okl., 695 P.2d 498, 504 (1985); *Roxana Petroleum Co. v. Cope,* 132 Okl. 152, 269 P. 1084, 1085 (1928) (the court's syllabus ¶ 3); *Reaves v. Reaves,* 15 Okl. 240, 82 P. 490, 495 (1905); *State Mut. Life Assur. Co. of Amer. v. Hampton,* Okl., 696 P.2d 1027, 1034, 1036 (1985) (Opala, J., concurring).

13. *Fuller v. Odom,* Okl., 741 P.2d 449, 451 (1987); *McCormack v. Oklahoma Pub. Co.,* Okl., 613 P.2d 737, 740 (1980); *Reaves, supra* note 12, 82 P. at 495; *Hampton, supra* note 12, 696 P.2d at 1036 (Opala, J., concurring).

14. *Reaves, supra* note 12, 82 P. at 495; *Hampton, supra* note 12, 696 P.2d at 1036 (Opala, J., concurring).

15. *Brigance v. Velvet Dove Restaurant, Inc.,* Okl., 725 P.2d 300, 303 (1986), quoting *McCormack, supra* note 13, 613 P.2d at 740. *See also Vanderpool v. State,* Okl., 672 P.2d 1153, 1157 (1983).

16. 12 O.S.1991 § 1443.1 provides:
"A. A privileged publication or communication is one made:
First. In any legislative or judicial proceeding or any other proceeding authorized by law;
Second. In the proper discharge of an official duty;
Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers...."

17. *Tate, supra* note 12 at 1225–26; *Hampton, supra* note 12 at 1035–36 (Opala, J., concurring).

18. *Media* as used in the context of the common law is a more inclusive term than newspaper or print media. The RESTATEMENT (SECOND) OF TORTS § 581 is very clear that *"third person publisher"* includes not only the press but also *television and radio.* *See also,* RESTATEMENT § 581 comment (g).

## IV

### SINCE THE DISTRICT ATTORNEY'S COMMENTS AT THE CRITICAL PUBLIC NEWS CONFERENCE DEALT WITH ACTIVITIES OF HIS OFFICE AND WERE OF GENERAL PUBLIC INTEREST, THEY MUST BE TREATED AS *OFFICIAL*.

The critical district attorney's news conference, called at the Delaware County courthouse, is to be treated as an *official* function of that office. A district attorney's participation in and conduct of criminal investigations is explicitly contemplated by Oklahoma statutes.[19] *The official nature of public activities within a particular office may be divined from its settled practices— regardless of whether these practices are completely defined by written rules or statutes*—by resort to the common-law sources

19. *See* 19 O.S.1991 § 215.1 *et seq.* The statute *explicitly recognizes* official activities of the district attorney's office to be broader than its traditional prosecutorial functions. The terms of 19 O.S.1991 § 215.4 provide in pertinent part:

"The district attorney may at all times request the assistance of district attorneys, assistant district attorneys or district attorney investigators from other districts who then may appear and assist in the prosecution of actions for crime or assist in *investigation of crime* in like manner as assistants or investigators in the district." [Emphasis added.]

20. *Whitney v. United States,* 99 F.2d 327, 330 (10th Cir.1938).

21. The importance of dissemination by lawyers of information to the public is explicitly acknowledged in 5 O.S.1991, Ch. 1, App. 3–A, Rule 3.6(d), where specific guidelines are found regarding *trial publicity.* These guidelines provide that in the context of an *investigation* a lawyer could state without elaboration: "(3) that an investigation of a matter is in progress, including the general scope of the investigation, ... and, except when prohibited by law, the identity of the persons involved."· The rule also allows disclosure of the identity of the investigation officers and agencies and the length of the probe. The comment to Rule 3.6 in the American Bar Association, ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT, 2d edition, states:

"[T]here are vital social interests served by the free dissemination of information about events having legal consequences and about legal proceedings themselves. The public has a *right* to know about threats to its safety and measures aimed at assuring its security." *Id.* at 378. [Emphasis supplied.]

reflecting upon that office.[20] District attorneys in Oklahoma have historically used press conferences to distribute information about the activities of their offices to the citizenry they represent. Disseminating information to the public[21] enhances, within the communities served by the prosecutor's office, confidence and understanding of his governmental mission.[22] After an objective assessment of the critical *occasion* at which the comments under scrutiny were made,[23] we conclude that the news conference covered by Grove Sun's publications was an activity conducted within the penumbra of the *official* duties of the Delaware County District Attorney's office. His comments, together with the materials disseminated, which were of *general public interest,* must be treated as *official* because they concern the investigative function of the office.[24]

22. English and American jurisprudence is replete with panegyrics on the value of openness and publicity in promoting confidence in the administration of a legal system. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 566–572, 100 S.Ct. 2814, 2821–25, 65 L.Ed.2d 973 (1980). *See also, McCormick v. Specter,* 220 Pa.Super. 19, 275 A.2d 688, 689 (1971), where the court held that "the responsible performance of the District Attorney's office warrants his informing the public of matters pending in that office."

23. Assessment of the district attorney's motives in holding the news conference is not called for. Comment on the motive of the district attorney in calling the critical news conference would be inappropriate because, even if the prosecutor's aims were wrongful, they would not be imputable to the publisher who unquestionably meets the *fair report privilege* standards. In concluding that the news conference in dispute here was a function of the district attorney's office and of general public interest, we applied the rationale of *Harlow v. Fitzgerald,* 457 U.S. 800, 815–819, 102 S.Ct. 2727, 2736–38, 73 L.Ed.2d 396 (1982). There the Court *purged* the qualified immunity doctrine [when applied in the context of 42 U.S.C. § 1983] of its *subjective* components.

24. *See Barr v. Mateo,* 360 U.S. 564, 572–576, 79 S.Ct. 1335, 1340–42, 3 L.Ed.2d 1434 (1959). There the Court considered whether a press release issued by the acting director of the Office of Housing Expediter concerning two employees of his agency was privileged and the official issuing the release hence exempt from liability for libel. The Court held "[t]he fact that the action here taken was within the *outer perimeter* of the [official's] line of duty is enough to render the privi-

## V

### UNDER THE FACTS REVEALED BY THE RECORD IN THIS CASE THE COMMON–LAW FAIR REPORT PRIVILEGE IS A COMPLETE DEFENSE TO LIBEL.

▮▮▮▮ The elements of the common-law *fair report privilege*, drawn from the seventeenth and eighteenth century English developments, are defined in the RESTATEMENT (SECOND) OF TORTS § 611. The text of that section is:

> The publication of defamatory matter concerning another in a report of an *official* action or proceeding or of a meeting *open to the public* that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.[25] [Emphasis added.]

The privilege[26] is not conditioned upon the truth or falsity of the reported material, the character of the defamed person, nor on the newsworthiness of the event; rather, its applicability is determined by the *nature of the occasion* at which the republished material was secured for news coverage.[27] The critical occasion here is the district attorney's news conference—a legitimate activity of his office, open to the public and held for the purpose of addressing a matter of general concern to the community. As the privilege is *qualified*, its abuse and loss would occur if the newspaper does not *accurately* and *fairly* republish that which was gathered from a public meeting, or if the republished material is *not* of general public interest.[28]

▮▮▮▮ The court of appeals rested its opinion on the *neutral reportage privilege.*[29]

---

lege applicable...." *Id.* 360 U.S. at 575, 79 S.Ct. at 1341. [Emphasis added.] *See also, Buckley, supra* note 1. In *Buckley* the Court held that a *qualified common-law privilege* for materials disseminated at a press conference held by a district attorney would afford a prosecutor a defense to claims arising under 42 U.S.C. § 1983. The Court there concluded:

> "The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions. *Statements to the press may be an integral part of a prosecutor's job ... and they may serve a vital public function.* But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and ... qualified immunity is the norm for them." *Id.* —— U.S. at ——, 113 S.Ct. at 2618. [Emphasis added.]

**25.** *See Sciandra, supra* note 1; *Brandon v. Gazette Publishing Co.,* 234 Ark. 332, 352 S.W.2d 92, 94 (1961); *Phoenix Newspapers, supra* note 1; *Abram v. Odham,* 89 So.2d 334, 336 (Fla.1956); *Borg v. Boas,* 231 F.2d 788, 795 (9th Cir.1956); *Pulvermann v. A.S. Abell Company,* 131 F.Supp. 617 (Md.D.Ct.1955); *Briarcliff Lodge Hotel v. Citizen–Sentinel Publishers,* 260 N.Y. 106, 183 N.E. 193, 197 (App.1932); *Fortney* and *Garby, supra* note 1.

**26.** The *fair report privilege* had its genesis in *Curry v. Walters* [1796], 126 Eng.Rep. 1046. While it was initially recognized in the reporting of judicial proceedings, in the following decades the English courts *expanded* its application to other occasions. *See King v. Wright* [1799], 101 Eng.Rep. 1396; *Carr v. Hood,* [1808] 170 Eng. Rep. 983; *Wason v. Walter* [1868], L.R. 4 Q.B.

73; *Lyon v. Daily Telegraph* [1943], L.R. 1 K.B. 746; *Braddock v. Bevins* [1948], L.R. 1 K.B. 580. The common-law privilege was further expanded in 1881 by acts of Parliament. *See supra* note 9. As the law of libel has grown, American courts saw fit to extend special defenses [found either in the common law or in statutes] to situations not contemplated when the privilege first came to be crafted. *See Kirschstein v. Haynes,* Okl., 788 P.2d 941 (1990); *Pulvermann, supra* note 25; *Coleman v. Newark Morning Ledger Co.,* 29 N.J. 357, 149 A.2d 193 (1959). *See also,* R.W.C., The Developing Privilege of Neutral Reportage, 69 VIRGINIA L.REV. 853, 856 (1983).

**27.** *See* RESTATEMENT (SECOND) OF TORTS § 611 comment a (1977); *see also,* PROSSER AND KEETON ON TORTS, *supra* note 1 at 836–38.

**28.** *See* RESTATEMENT (SECOND) OF TORTS, *supra* note 27; *see also, Watt v. Longsdon* [1929] L.R. 1 K.B. 130.

**29.** *See Edwards v. National Audubon Society, Inc.,* 556 F.2d 113 (2d Cir.1977), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), in which the U.S. Court of Appeals for the Second Circuit fashioned an *expansion* of the common-law *fair report privilege* by holding that the First Amendment of the U.S. Constitution provides a qualified *constitutional* privilege as a defense to libel in situations where (1) the source relied upon by the newspaper was "responsible and prominent"; (2) the subject of the third-party comments was a public figure or official, i.e., "newsworthy"; (3) the newspaper coverage was accurate; and (4) the reporting was "fair", "disinterested", "reasonable" and in "good faith". The *neutral reportage privilege* is *not* the

While the impetus for invoking the *constitutional neutral reportage privilege* and the *common-law fair report privilege* may in some instances be the same, the former rests on *fundamental-law* underpinnings. It mandates a different allocation of the pleading's burden and its scope is broader than that of the latter doctrine [30]. We do not reach for discussion today the applicability of the *constitutional privilege of neutral reportage* recognized by the U.S. Court of Appeals for the Second Circuit. When, as here, the legal relief sought clearly is affordable upon *alternative* grounds, the common-law *fair report privilege*, consideration of constitutional challenges is inappropriate in view of our self-erected "prudential bar" of restraint.[31]

◼ The facts before us clearly establish that the district attorney called a news conference *open to the public*, whose subject was the conduct of a drug investigation by his office—a matter of *general public concern* in the community he served—and that Grove Sun *accurately and fairly* republished the contents of an affidavit distributed as part of his news conference. The record provides abundant support for allowing the publisher its common-law *fair report privilege* as a complete defense to Wright's libel claims.[32]

## VI

## COVERAGE BY THE MEDIA OF AN OFFICIAL PUBLIC EVENT IS NOT ACTIONABLE AS AN OUTRAGE IF IT MEETS THE REQUIREMENTS OF THE FAIR REPORT PRIVILEGE.

◼ As an additional theory of liability, plaintiff has asserted a claim based on the intentional infliction of emotional distress.[33] For a defendant to be charged with delictual responsibility on this theory, it must be found [by the trial court] that the defendant's conduct was so outrageous as to be "beyond all possible bounds of decency" or was to be regarded as "utterly intolerable in a civilized community." [34] Since fair and accurate media coverage of official public occasions is in the highest and best interest of the public, Grove Sun's conduct cannot be treated as actionable under this rubric.[35] We hence affirm today the *nisi prius* decision that Grove Sun's pleaded conduct is not actionable as an intentional infliction of emotional distress.

same as, and should not be confused with, the *fair report privilege* of the common law. The standards for applying the two privileges are different. For further discussion of the *neutral report privilege* see Rodney A. Smolla, *Law of Defamation* § 4 at p. 69 (1993); Donna Lee Dickerson, 3 Com. & L., No. 3, pp. 77–86 (Summer 1981). In *Crittendon v. Combined Communications Corp.*, Okl., 714 P.2d 1026 (1986), this court, when addressing privileges available to the media in libel actions, did *not* reach the issue whether the neutral reportage privilege would avail in this jurisdiction. Rather, it decided the case upon a statutory-privilege basis.

**30.** The party asserting the *common-law* privilege has the burden of pressing it by pleading and proving the existence of its elements. As for *constitutional* privileges or immunity, the plaintiff has the burden of *alleging* and *proving* that the defendant had knowledge or acted in reckless disregard of the falsity of the published material. *See* Restatement (Second) of Torts § 580A comment e. The *fair report privilege* protects the accurate and fair reporting of material distributed at official public occasions. The *neutral reportage privilege* appears to extend to the fair and accurate coverage of statements of private persons to the media and hence goes *beyond* the sweep of the common-law privilege.

**31.** *I.N.S. v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) and *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). *See also, Smith v. Westinghouse Elec. Corp.*, Okl., 732 P.2d 466, 467 n. 3 (1987); *Schwartz v. Diehl*, Okl., 568 P.2d 280, 283 (1977); and *Dablemont v. State Department of Public Safety*, Okl., 543 P.2d 563, 564 (1975).

**32.** Since the material published by Grove Sun was privileged, it is not necessary for us to reach for discussion the question whether the material was libelous *per se* or libelous *per quod*.

**33.** Oklahoma recognizes as an independent tort the intentional infliction of emotional distress. The delict is also known as the tort of outrage. It is governed by the narrow standards of Restatement (Second) of Torts § 46. *See Eddy v. Brown*, Okl., 715 P.2d 74, 76 (1986); *Breeden v. League Services Corp.*, Okl., 575 P.2d 1374 (1978).

**34.** *Eddy, supra* note 33; *Breeden, supra* note 33.

**35.** *Eddy, supra* note 33.

## VII

## THE LEGAL FALLACY
## OF THE DISSENT

The dissent advances *four reasons* why Grove Sun should not be afforded the privilege. Three of the arguments are in reality but restatements of the same theme—the district attorney's press conference was not *official.* The remaining argument evidences the author's belief that since the *common law* inherited from England "died" in 1776, American courts must draw precedent *only from* jurisprudence born on this side of the Atlantic, which incorporates the *pre-1776 English common law.*[36]

As a general comment on the dissent's cited authority, it suffices to say that it fails to distinguish between the *immunity* which might be available to the district attorney and the *privilege* which is the newspaper's due. Initially, the dissent analyzes this case solely from the perspective of defamation law and without any regard to *freedom of the press.* The difference between the *status-based* immunity of the prosecutor and the *transaction-based* privilege of the publisher is also ignored. Secondly, there is a failure to perceive the difference between the *fair report privilege* and the *fair comment privilege* of the common law.[37] The first deals with accurate and fair reporting of public events *sans* judgmental gloss. The second covers comments or criticism of general public interest. Grove Sun reprinted *verbatim* the material disseminated by the district attorney; it offered *no* comment or editorial gloss with reference to Mr. Wright. The law governing the *fair comment privilege* is absolutely irrelevant to this controversy.

The dissent ignores the broad range of *media* contemplated by the RESTATEMENT (SECOND). It plainly includes *not only* the *press* but also *radio* and *television.*[38] The effect of the dissent's position would be that *live* television coverage of official press conferences of public officials could not be conducted without exposing the station to liability for republication. The authorities which most strongly support the dissent are easily distinguishable upon the facts. Here Grove Sun's agents attended a press conference called by the district attorney—an elected public official. Cases most heavily relied upon by the dissent relate to libelous articles based upon information secured by reporters, at the time of arrest or initial incarceration *but before any judicial action was taken, from police officers or some unofficial gossip mongers.*[39] These cases do not address an event in which information was disseminated by an elected public official at a press conference open to the general public. Central to the § 611 privilege we adopt today is that the information was garnered at meetings *open to the public* and not from *private*

---

**36.** The dissent's premise is firmly contradicted by Oklahoma's jurisprudence. *See McCormack, supra* note 13 at 740; and other authorities that interpret our reception statute, 12 O.S.1991 § 2.

**37.** For a discussion of the difference between these two privileges, see *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 87 (D.C.App.1980).

**38.** *See supra* note 18.

**39.** In *Jones v. Neighbor Newspapers, Inc.,* 142 Ga.App. 365, 236 S.E.2d 23 (1977), an authority relied upon by the dissent, the appellate court succinctly pronounced the test for application of the *fair report* privilege. The court there stated:

"What is usually required is that the publication shall be substantially accurate; and if the article is published by the newspaper in good faith and the same is substantially accurate, the newspaper has a complete defense." *Id.* 236 S.E.2d at 25.

In *McAlister v. Detroit Free Press Co.,* 43 N.W. 432, 484 (Mich.1889), the source of the reporter's data was an overheard conversation between the chief of police and a magistrate. In *Burrows v. Pulitzer Pub. Co.,* 255 S.W. 925, 930 (Mo. 1923), the reporter's source was a *desk sergeant.* In *Kelly v. Independent Pub. Co.,* 45 Mont. 127, 122 P. 735, 737–38 (1912), the information was garnered from the sheriff's office and the court specifically found that the report did not emanate from an official public proceeding upon which the privilege could have been founded. In *Jastrzembski v. Marxhousen,* 76 N.W. 935, 937 (Mich.1899), the reporter secured statements from parties to the incident and this was the basis for the newspaper article; there was *no* reliance on information disseminated by a public official. The court in *Phillips,* note 37, recognized the *fair report privilege* as applicable to "reports of any official proceeding or action taken by any officer or agency of government". *Id.* at 88. The developed facts in *Phillips* did not require the application of privilege.

conversations between reporters, victims and/or police officers.[40] Police officers, the source of information in many of the dissent's authorities, were not *by anyone's count officially speaking for a public office.* In some of the relied-upon cases the published articles contained judgmental newspaper gloss or offered unfounded comment/opinion upon the events or facts covered.[41] These articles were clearly outside the scope of the *fair report privilege;* they *did not* deal with fair and accurate media republication.

It is the dissent's position that the *fair report privilege* is but coextensive with the *statutory* privilege codified in 12 O.S.1991 § 1443.1. According to the dissent, because the statute relates to the same subject matter as the common-law privilege—*privileged communication*—the former abrogates the common-law privilege by substitution of the legislature's understanding of what that privilege means. This conclusion is inconsistent with our extant jurisprudence. Our case law plainly teaches that abrogation of the common law must be clearly and plainly expressed.[42]

The dissent depreciates the authority of § 611 by stating that the jurisprudence cited in this opinion to support the RESTATEMENT (SECOND) OF TORTS § 611 does not specifically mention that section of the RESTATEMENT (SECOND). A review of Tentative Draft No. 20 of the RESTATEMENT (SECOND) OF TORTS § 611 will reveal that the authority questioned was in fact relied *upon by the RESTATEMENT'S (SECOND) redactors.*

Today's opinion carefully balances freedom of the press, the need of the public to be informed, and the individual rights of private citizens to be free from harm to one's reputa-tion. While the dissent *would have readers believe otherwise, today's pronouncement is narrowly limited to situations where the media, sans any trickle of judgmental gloss, republish information disseminated by public officials at press conferences open to the public.* It does not address itself to any *immunity* the district attorney might interpose. Since a fair reading of § 1443.1 does not reveal a clearly expressed intent to abrogate *the common-law fair report privilege,* now at least a century old, it continues viable and will not be held to have been abridged by the narrower purview of § 1443.1.

## VIII

## SUMMARY

When, as here, the *nisi prius* judgment may be supported by any applicable theory, it *must be affirmed.*[43] Both statutes and jurisprudence, when applied to the facts in the record, impel our conclusion that Grove Sun is entitled to the common law *privilege of fair report* as a complete defense to Wright's libel claims. As the interests of both the government and the public are best served when the press can report without chilling circumspection about *official public events,* if its coverage is fair, accurate and *sans* judgmental gloss, it cannot be said that media conduct well within the protection of this privilege is actionably outrageous.

**ON CERTIORARI PREVIOUSLY GRANTED, THE COURT OF APPEALS' OPINION IS VACATED AND THE TRIAL COURT'S DISMISSAL ORDER IS AFFIRMED.**

---

**40.** *See Jastrzembski, supra* note 39; *see also, Kirby v. Pittsburg Courier Pub. Co.,* 150 F.2d 480, 482 (2d Cir.1945), where the source of the newspaper article was a conversation on the street between the reporter and a member of the draft board. In *Kirby* the court noted that it did not even consider whether the publication was privileged as an interpretation of an official record. The court in *Wood v. Constitution Pub. Co.,* 57 Ga.App. 123, 194 S.E. 760, 767 (1937), noted that the *source* of the reporter's article *was comments* made to him by a judicial officer *outside the discharge of his official duties.* In short, the cases cited by the dissent do not address circum-stances where the common-law *fair report* privilege could be invoked.

**41.** *See Houston Chronicle Pub. Co. v. Bowen,* 182 S.W. 61, 65 (Tex.App.1915).

**42.** *See supra* notes 11–15.

**43.** *Willis v. Nowata Land and Cattle Co.,* Okl., 789 P.2d 1282, 1286–87 (1990); *Davidson v. Gregory,* Okl., 780 P.2d 679, 685 n. 23 (1989); *Utica Nat'l Bank and Trust v. Assoc. Prod.,* Okl., 622 P.2d 1061, 1066 (1981); *Holloway v. Ward,* 84 Okla. 247, 203 P. 217, 219 (1922).

HODGES, C.J., and HARGRAVE, KAUGER and WATT, JJ., concur.

SIMMS, J., concurs in part and dissents in part.

LAVENDER, V.C.J., and ALMA WILSON and SUMMERS, JJ., dissent.

SIMMS, Justice, concurring in part, dissenting in part:

I agree with Justice Summers in that part of his writing which refuses to recognize that a press conference called by a district attorney for the obvious purpose of berating an announced political opponent is an "official function" of the office. To so hold, as does the majority, creates a situation where an incumbent district attorney may speak about any matter remotely connected with his office during his campaign with immunity, while his opponent is not so blessed. Likewise, publication by the media in one instance is protected and not protected in the other.

Nor do *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) and *McCormick v. Specter,* 220 Pa.Super. 19, 275 A.2d 688 (1971) support this thesis. *Richmond* deals with the issue of open and public trials, while *McCormick* treated statements made by a district attorney about a pending investigation in his office dealing with the plaintiff's business dealings with the City of Philadelphia. The Pennsylvania court wrote: "Thus, given the great potential for harm, the privilege must be limited to those statements and actions which are in fact "closely related" to the performance of those official duties". A statement made purely for political purposes does not meet this test.

I believe the majority reaches the correct result, but for a different reason.

In my opinion, the offending statement at issue was, at most, *libel per quod,* and the

appellant was required to plead special damages. The statement is susceptible of both a defamatory and an innocent meaning. There is no indication that Wright was engaged in the sale of drugs, merely that the officers were "trying" to make a buy. This statement, standing alone, does not impute a crime to Wright, nor is the statement susceptible of but one opprobrious meaning.

I would therefore affirm the trial court.

SUMMERS, Justice, concurring in part and dissenting in part:

I respectfully concur in part and dissent in part. The fair report privilege[1] does not protect the news conference and press release for four reasons. First, the District Attorney was not acting in his official capacity when he held the press conference. Second, the common-law fair report privilege has never been construed broadly enough protect press releases which are not based on official reports. Third, the fair report privilege as expressed in the Restatement (Second) of Torts, Section 611, should not cover a press release which was not based on an official report. Fourth, Oklahoma's statutory enactment of privilege in 12 O.S.1991 § 1443.1 abrogated the common law doctrine of fair report, and is thus the law as to whether a statement in Oklahoma is privileged. Section 1443.1 does not privilege the statements made in this case.

Suit was brought by Ace Wright, a private individual not connected with the district attorney's office or the police department. His claim arose from a press conference called by the District Attorney, in which the District Attorney released a written statement of a private telephone conversation between two police officers. The conversation was NOT excerpted from any official report or judicial proceeding. It was simply two officers talking informally about future plans for an investigation. Charges were not filed against

---

1. The majority *sua sponte* invokes the common law and/or Restatement sponsored "fair report privilege" to affirm. Were I writing for the majority I would address the "neutral reportage privilege" as created by *Edwards v. Nat'l Audubon Society, Inc.,* 556 F.2d 113 (2nd Cir.1977), *cert. denied* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) and urged by the newspaper.

Because the neutral reportage privilege has never been, and should not be, extended to make privileged those statements about *private* persons, such as Ace Wright, it is unnecessary to speculate whether the privilege should be adopted by Oklahoma were it invoked in some later case brought by a *public* figure, a proper case for consideration of the doctrine.

Ace Wright, and there was no indication in the record that the District Attorney was considering filing charges.

Wright insists that the District Attorney's purpose in calling the press conference was to discredit his political opponent. The news conference and press release apparently occurred during a heated election battle for District Attorney. The press release focused on the halt of an drug investigation. The District Attorney was not commenting on an ongoing investigation, but was attempting to shift the blame for the halted investigation to his political opponent.

## I. THE OFFICIAL DUTIES OF THE DISTRICT ATTORNEY

First, the acts of the district attorney of holding the press conference were in no way related to his official duties. Since he was not acting his official capacity, the privilege cannot apply. *Kirby v. Pittsburgh Courier Publ. Co.,* 150 F.2d 480, 482 (2nd Cir.1945); *Wood v. Constitution Publ. Co.,* 57 Ga.App. 123, 194 S.E. 760 (1937).

In *Short v. News–Journal Co.,* 58 Del. 592, 212 A.2d 718 (1965), a news release of the chief of delinquent accounts of the IRS was considered privileged. There, however, the chief was directly responsible—*under regulations of the IRS*—to release enforcement news to enhance compliance with tax laws and regulations. Relying on Section 611, the court found this to be within the privilege because one of the enumerated duties of the chief was press releases.

The duties of a district attorney are expressly set forth in 19 O.S.1991 § 215.4 et seq. The duties include the prosecution and investigation of criminal activity, 19 O.S.1991 § 215.4, the giving of advice to the board of county commissioners and other boards, 19 O.S.1991 § 215.5, administrative duties such as hiring a first assistant and filing an annual accounting, 19 O.S.1991 § 215.9 and 11, and attending grand juries, 19 O.S.1991 § 215.13. The statutes continue by stating that the powers and duties of the district attorney are those "powers, duties and functions provided

by law for the county attorney ..." 19 O.S.1991 § 215.16. There is no mention of a duty to hold press conferences for political purposes. Furthermore, a district attorney is constrained by 5 O.S.1991, Ch. 1, App. 3–A, Rule 3.6, from making certain types of extra-judicial statements to the press.

I have found no Oklahoma case which supports the majority's position that it is an official duty of the district attorney to hold press conferences for political purposes. While in some instances a press conference might fall within the boundaries of the enunciated duties, it did not in the present case.[2] There was no ongoing investigation or prosecution. There was no completed prosecution upon which the district attorney was commenting. There is no indication in the record that the district attorney was seeking to revive a past investigation or contemplating the filing of charges. He was simply trying to win an election.

*Magness v. Pledger,* 334 P.2d 792, 795 (Okla.1959) supports this position. There, this Court was faced with the question of whether a petition by a citizen to the Attorney General was a privileged report. The petition alleged wrongdoing on the part of county officials. In holding that the petition was not privileged, we relied on the fact that the Attorney General was not charged *by statute* with the duty of investigating allegations by citizens. The powers and duties of the Attorney General are "not unlimited and do[ ] not extend to matters beyond the power, authority and duties conferred...." *Id.*

In *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980) *cert. denied* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1980), the Fifth Circuit explained the duties of a prosecutor and defined the boundaries of absolute immunity with regard to a civil rights suit. The facts showed that a search warrant was executed at the plaintiff's place of business. The assistant district attorney accompanied the police officers to execute the warrant, and all the jewelry in the store was seized even though only one item was possibly sto-

---

**2.** *See Barto v. Felix,* 250 Pa.Super. 262, 378 A.2d 927, 930 (1977) and *McCormick v. Specter,* 220 Pa.Super. 19, 275 A.2d 688 (1971) for instances

when a prosecutor and a public defender are permitted to hold press conferences.

len property. The press arrived subsequently, and the prosecutor announced that over $75,000.00 in stolen property had been seized. The court granted the motion to suppress and required the return of all but one of the items to the plaintiffs. Plaintiffs brought suit for slandering their business reputation. The court held that the assistant district attorney was not entitled to absolute immunity from suit in this instance because "immunities are extended to governmental officials only when 'overriding considerations of public policy nonetheless deman[d] that the official be given a measure of protection from personal liability' to ensure his ability to function effectively." *Id.* at 503.[3] To determine whether the prosecutor was immune the court focused on the "functional nature of the activities." *Id.* at 504, quoting *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

Here, the prosecutor was acting in the absence of a case being filed. There were no ongoing judicial proceedings against the plaintiffs. Because the statements were not "intimately associated with the judicial phase of the criminal process," his statements to the press were extrajudicial, and thus not entitled to absolute immunity. *Id.* at 506, quoting *Imber*, 424 U.S. at 430, 96 S.Ct. at 995.

Likewise, in *Catalano v. Pechous*, 69 Ill. App.3d 797, 25 Ill.Dec. 838, 846, 387 N.E.2d 714, 722 (1st Dist.1978) *cert. denied* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1978), the court found that to be entitled to protection under the fair report privilege, the official must be acting in matters legitimately connected to and drawn from official responsibilities. *Id.* 69 Ill.App.3d at 806–807, 25

Ill.Dec. at 846, 387 N.E.2d at 722. There, the city clerk was held to be acting outside official duties when he made statements to the press about a public meeting. Even though the clerk's duties included keeping records to be made available to the public, his comments were outside the scope of the statutory duties. He was thus not entitled to rely on the fair report privilege.

II. The Common Law Privilege of Fair Report

A. English Doctrine

The historical notions of privilege date as far back as 1559, wherein courts held privileged certain statements made in the course of judicial proceedings. *Croke v. Grene*, K.B. 27/1190, m. 60 (1559); *see* Select Cases on Defamation to 1600 (Selden Society 1985).[4] In England, as the idea of privilege emerged, it took the form of protecting news reports of court trials. *Curry v. Walter*, 126 Eng.Rep. 1046, (C.P.1796); *Dawkins v. Rokeby*, L.R. 7 Q.B. 744 (1875); *see generally* Levy, Emergence of a Free Press. (1985). The fair report privilege, as it became known, was later extended to parliamentary accounts and debates. *King v. Wright*, 101 Eng.Rep. 1396 (K.B.1799); *Wason v. Walter*, L.R. 4 Q.B. 73 (1868). When it became apparent that the courts were unwilling to extend the fair report privilege beyond those instances already covered, the Parliament enacted legislation to privilege reports of official meetings lawfully convened. *See* Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report*, 54 N.Y.U.L.Rev. 469, 478 (1979) (hereinafter cited as *Defamation and the First Amendment*).[5] Again in 1952, the Parliament ex-

---

3. Quoting *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

4. *See also* Levy, L.W., Emergence of a Free Press (1985).

5. It is important to note that this privilege was not formally enunciated until long after the settlement of the first colonies in America. Although the majority opinion correctly asserts that we, as a state, adopted the common law as an aid to the general statutes of Oklahoma, several Oklahoma cases explain that the common law adopted is that of England *at the time the settlers landed in America*. In *McKennon v. Winn*, 1

Okla. 327, 33 P. 582, 584–85 (1893) the Oklahoma Supreme Court explained this principle:

The English-speaking people brought the common law to America with them, in the first settlement of the colonies ... and such of the English statutes adopted prior to the settlement of our colonies as were of general application, and suit to our conditions....

... [W]hen people from all parts of the United States on the 22d day of April, 1889, settled the country known as Oklahoma, built cities, towns, and villages, and began to carry on trade and commerce in all its various branches, they brought into Oklahoma, with them, the

tended the fair report privilege to includes public meetings held for a lawful purpose. *See Defamation and the First Amendment,* at 526 n. 269.

Contrary to the assertion in the majority opinion, I have found no cases in which a press release containing the transcript of a non-public conversation was held privileged.[6] In fact, as the majority notes, the underlying basis of the fair report privilege is that the press, as an agent of the public, should be permitted to print reports of those events open to the public. Here, the telephone conversation was not open to the public nor were its contents part of any official proceeding. It was not part of a judicial or legislative record. It was simply the written statement of a telephone conversation. The policies behind the English fair report privilege do not lend support for its extension into this new area.

B. American Privilege of Fair Report

Since the English doctrine of fair report privilege was not in existence until after the settlers of the colonies had arrived in America, the states did not accept in total the English privilege of fair report. Thus, the fair report privilege, as developed by American courts, is similar to but not an exact mirror of the English doctrine. D. Dobbels,

*Edwards v. Nat'l Audobon Society, Inc.: A Constitutional Privilege to Republish Defamation Should Be Rejected,* 33 Hastings L.J. 1203, 1205 n. 16 (1982) (hereinafter cited as *Edwards v. Nat'l Audobon*); V. Harper, F. James and O. Gray, The Law of Torts, §§ 5.23 and 5.24 (2d Ed.1986). The policies behind the privilege are consistent with those enunciated by the English courts: to accommodate the public and social interest in the availability of information about official proceedings and meetings. *See Edwards v. Nat'l Audobon,* at 1207. Each state has determined whether the privilege is applicable and to what extent.[7] However, only a minority of jurisdictions have extended the privilege to a public, non-official proceeding.[8] Most have held the privilege to be much more narrowly proscribed than is urged by the majority opinion. To avoid the swallowing of the law of libel, most courts recognize strong limitations on the privilege. The majority opinion casts aside this concern, and leaves private individuals without a remedy for defamation, even when the defamation does not arise from an official proceeding.

In most jurisdictions, the extent of the privilege has been decided by the legislature. Many states have enacted legislation similar to that in Oklahoma, and hold that to be the

---

established principles and rules of the common law, *as recognized and promulgated by the American courts, and as it existed when imported into this country by our early settlers,* and unmodified by American or English statutes. (Emphasis Added).
*See also Meyer v. White,* 79 Okla. 257, 192 P. 801 (1920); *Creekmore v. Redman Ind., Inc.,* 671 P.2d 73, 76–77 (Okla.Ct.App.1983).
Thus, in the present case, the American common law is that which is relevant. English common law in the area of the fair report privilege serves only as a helpful backdrop. This view—the one followed by this Court—is in line with the holdings of a majority of jurisdictions. *See, e.g., State v. Criqui,* 105 Kan. 716, 185 P. 1063 (1919); *Hannah v. State,* 212 Ga. 313, 92 S.E.2d 89 (1956); *Cooper v. Runnels,* 48 Wash.2d 108, 291 P.2d 657 (1955). For a summary of states following this view, see 15 C.J.S. § 4 and 13.

**6.** See majority opinion, footnote 1, wherein the majority asserts that at common-law, the privilege included news conferences. None of the cases cited as support for this statement involved a press release of an unofficial document.

*Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963) involved the release of a report commissioned by the Governor of the state. It was an official report directed by the Governor to be filed following a thorough investigation of organized crime. In *Phoenix Newspapers v. Choisser,* 82 Ariz. 271, 312 P.2d 150 (1957), the newspaper reported a political debate held at a town meeting. In *Fortney v. Stephan,* 237 Mich. 603, 213 N.W. 172 (1927), the newspaper printed articles accusing the sheriff of misconduct in office. *Garby v. Bennett,* 166 N.Y. 392, 59 N.E. 1117 (App.1901) involved statements made about a state legislator and legislation he had introduced. It was based on statements made while he was acting as a legislator.

**7.** For a thorough review of the history of the emergence of special privileges in America, see Levy, *supra.*

**8.** See *Pinn v. Lawson,* 72 F.2d 742, 744 (D.C.Cir. 1934) (church meeting); *Morin v. Houston Press Co.,* 103 S.W.2d 1087, 1090 (Tex.Civ.App.1937) (campaign speech).

state's rule of privilege.[9]   Courts have applied the privilege in varying degrees, but generally circumscribe its boundaries to privilege only legislative, judicial, executive or other official proceedings.   *See* The Law of Torts, *supra; Jones v. Neighbor Newspapers Inc.,* 142 Ga.App. 365, 236 S.E.2d 23 (1977).

As for the situation presented in this case, courts generally hold that informal police remarks are not privileged because "extrajudicial defamation of the citizenry by the police is not a vital process of democratic government."   The Law of Torts, at 206. Further, the fact that the conversation was later transcribed into written form does not make it privileged as an "official" document.

In *McAllister v. Detroit Free Press Co.,* 76 Mich. 338, 43 N.W. 431 (1889), the court held that newspaper articles were not privileged. A citizen had been arrested for the illegal sale of stamps; he was later released and the charges dropped.   The reporter published two articles about the arrest, noting that earlier there had been a crime involving the stealing of stamps.   The court remanded the case for a trial:

> [T]he reporter of a newspaper has no more right to collect stories on the street, or even to gather information from policemen or magistrates out of court, about a citizen, and to his detriment, and publish such stories and information as facts in a newspaper, than has a person not connected with a newspaper to whisper from ear to ear the gossip and scandal of the street. If true, such publication or such speaking may be privileged, but, if false, the newspaper as well as the citizen must be responsible to any one who is wronged and damaged thereby.

*Id.* 43 N.W. at 437.

This is the general rule: Statements made by police officers in a preliminary investigation are not privileged, nor are informal statements made by prosecutors in interviews or press releases.[10]   In *Yerkie v. Postnewsweek Stations, Michigan, Inc.,* 470 F.Supp. 91 (D.Md.1979), the plaintiff brought a defamation action for a report alleging criminal conduct.   The federal district court held that the privilege did not apply to statements of the prosecuting attorney which were not yet part of a judicial proceeding:

> While a privilege applicable to reports of official proceedings applies to a report of the fact of arrest or the fact that a charge has been made, it does not apply to statements made by the police, by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or evidence expected to be given which have not yet been made a part of the judicial proceeding or of the arrest process.   *See Restatement* (Second) *of Torts,* Section 611, Comment D.   In the instant case, there was never an arrest or judicial proceeding and the qualified privilege relating to the reports of such proceedings is not applicable. ᐧ

*Id.* at 93–94.   The court continued by stating United States Supreme Court had forbidden

**9.**   *See Jones v. Neighbor Newspapers, Inc.,* 142 Ga.App. 365, 236 S.E.2d 23 (1977); *Stewart v. Enterprise Co.,* 393 S.W.2d 372 (Tex.Ct.App. 1965); *Painter v. E.W. Scripps Co.,* 104 Ohio App. 237, 4 O.O.2d 388, 148 N.E.2d 503 (1957); *Kelley v. Hearst Corp.,* 2 A.D.2d 480, 157 N.Y.S.2d 498 (1956); *Kelly v. Independent Publ. Co.,* 45 Mont. 127, 122 P. 735 (1912); *Billet v. Times–Democrat Pub. Co.,* 107 La. 751, 32 So. 17 (1902).

**10.**   *Lancour v. Herald & Globe Ass'n,* 111 Vt. 371, 17 A.2d 253 (1941) (a preliminary police investigation is not privileged); *Burrows v. Pulitzer Pub. Co.,* 255 S.W. 925 (Mo.App.1923) (article was not privileged even though there was a written police report because the news in the article was obtained from a desk sergeant); *Houston Chronicle Pub. Co. v. Bowen,* 182 S.W. 61 (Tx.Ct.App.1915)

(newspaper published article about plaintiff being held for a murder and court held the article not privileged because not based on documents filed in an official proceeding authorized by law); *Kelly v. Independent Publ. Co.,* 45 Mont. 127, 122 P. 735 (1912) (article not privileged because it was based on oral reports of a sheriff before any charges were filed); *Billet v. Times–Democrat Pub. Co.,* 107 La. 751, 32 So. 17 (1902) (neither common convenience nor the interests of society require that the suspicions of police officers be published to the world and thus, such suspicions whether written or oral are not privileged); *Jastrzembski v. Marxhausen,* 120 Mich. 677, 79 N.W. 935 (1899) (information given by a police officer, but not contained in a court file was not privileged).   *See also* The Law of Torts, *supra.*

the privilege to be extended on the basis of newsworthiness.[11]

In *Phillips v. Evening Star Newspaper*, 424 A.2d 78 (D.C.Ct.App.1980) *cert. denied* 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1980), a private citizen brought suit for defamation resulting a newspaper article which stated that he shot his wife during a quarrel. In fact, the shooting was accidental. The article was based on a "hot line" dispatch from the police. The court held that the newspaper could not rely on the fair report privilege. *Id.* at 88. Relying on the comments in the Restatement (Second) and Section 611, the court held that this was not an instance in which the privilege applied. Public policy behind the privilege did not extend to this type of situation:

> This log representing the oral police communication from which the Star composed its article does not carry the dignity and authoritative weight as a record for which the common law sought to provide a reporting privilege.

*Id.* at 89. *See also Colpoys v. Gates,* 118 F.2d 16 (D.C.Cir.1940) (U.S. Marshall was not privileged in making a press release)

One respected treatise explains the reasons which such communications should not be privileged as fair report:

> In the constantly growing state executive bureaucracies and in the sprawling county and municipal governments there are many inferior officials who are political hacks with little, if any, real sense of social responsibility. Giving such persons a conditional privilege to defame an innocent person may given them the power to destroy him because of his inability to prove that the conditionally privileged occasion was abused ... When the inferior state official, or the municipal official, makes a report to a superior, in the performance of

his duty, the number of persons who hear or read the defamation is limited and they are, presumably, interested in receiving accurate reports. A serious defamatory charge is likely to be kept confidential and may result in further investigation and correction of the falsehood. The situations which are devastating, and can irreparably harm a person's good name are those in which there is publication to person who have no duty to keep the information confidential or to take official action with respect to it ... The issuance of press releases by inferior official, on their own authority, should not be considered as a publication in the performance of official duties. A press release may be read by millions. A ruling that there is a conditionally privileged occasion for an inferior official to hand out a press release is a temptation to publicity-hungry little men and women which many will be unable to resist. Sound public policy does not require this shield of protection. It is to be hoped that the courts will not hesitate, except in an extraordinary case, to rule that the inferior officials press release is no part of the performance of his official duties.

L. Eldredge, The Law of Defamation 504–505 (1978). *Accord.* W.P. Prosser et al., Prosser and Keeton on Torts, § 114 (5th Ed.1984).

Based on these views, I do not agree that the district attorney's press release was privileged under the American common law. It is not the type of statement which requires protection to ensure the public's right to information. It was not contained in a formal report filed by the police, nor filed in any court proceeding. The statement of the district attorney would have been just as persuasive had the name of Ace Wright been omitted to protect his reputation.[12] As an

**11.** Here, the majority opinion states that because the district attorney's statement was of public interest, it was privileged. The United States Supreme Court, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) expressly rejected a similar argument, and held that newsworthiness was not an adequate criteria to warrant the publication of material. Although *Gertz* did not address the "public interest" idea with regard to fair reporting, it specifically held that constitutional protection could not be based on the public's interest in a newsworthy story.

**12.** The relevancy of the matter contained in the report has also been the basis for denying coverage by the privilege. If the defamatory statement is not necessary and relevant to the purpose of the publication, it is not privileged. *Sullivan v. Strahorn–Hutton–Evans Comm'n Co.,* 152 Mo.

informal oral communication between police officers, it does not carry with it the "dignity and authoritative weight of a record for which the common law sought to provide a reporting privilege." *See Phillips, supra.* If false, it is exactly the type of statement for which liability is imposed under the laws of libel.

## III. RESTATEMENT (SECOND) OF TORTS, SECTION 611

The majority opinion also relies on the Restatement (Second) of Torts, Section 611 as justification for the extension of the fair report privilege to the present case. *However, the comments following Section 611 expressly reject the idea that the privilege extend to the press releases dealing with non-official business.*

As the majority correctly states, Section 611 states that reports of "official action or proceeding or of a meeting open to the public that deals with a matter of public concern" are privileged. But comment (h) following Section 611 makes clear that the Restatement does not contemplate the extension of the privilege to instances like those present in our case:

> h. Arrest. An arrest by an officer is an official action, as a report of the fact of the arrest or of the charge of the crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section. *On the other hand statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section.* (Emphasis Added)

268, 53 S.W. 912 (1899); *Hines v. Shumaker,* 97 Miss. 669, 52 So. 705 (1910); *Lathrop v. Sundberg,* 55 Wash. 144, 104 P. 176 (1909). *See also Huntley v. Ward,* 6 C.B. (n.s.) 514, 141 Eng.Rep. 557 (1859). *See generally* L. Eldredge, *supra* at § 93. One court has denied the extension of the privilege because the newspaper article had a greater "sting" than did the judicial documents. *Newell v. Field Enterprises, Inc.,* 91 Ill.App.3d 735, 47 Ill.Dec. 429, 415 N.E.2d 434 (1st Dist. 1980).

In *Phillips, supra,* the court relied on comment (h) to hold that the police "hot line" was not an official report so as to fall within the privilege. Quoting directly to Section 611 and comment (h), the court stated "[n]ot being an arrest record nor a record required by statute or some other authority, but instead merely constituting a hearsay statement by police of facts of a case, the hot line will not qualify as an official record for purposes of this privilege." 424 A.2d at 89. *See also Yerkie,* 470 F.Supp. at 94; *Coleman v. Newark Morning Ledger Co.,* 29 N.J. 357, 149 A.2d 193 (1959).

Likewise, in *Kelley v. Hearst Corp.,* 2 A.D.2d 480, 157 N.Y.S.2d 498 (1956), the defendant newspaper asserted the fair report privilege. In remanding the case, the court relied on Section 611 as an accurate statement of New York law regarding the privilege. However, the court continued by pointing out that mere investigations and suspicions of police officers are not "official proceedings" so as to be privileged. In *Kelley,* the article stated that "police said" the plaintiff had threatened to kill his wife. However, the statements were not shown to be in an official report, and thus they were not necessarily privileged. *See also Heard v. Neighbor Newspapers, Inc.,* 259 Ga. 458, 383 S.E.2d 553 (1989) (construing a similar statutory provision, court held that statement contained in report of an investigator of the Dept. of Human Resources was not privileged); *Hyde v. City of Columbia,* 637 S.W.2d 251 (Mo.Ct.App.1982) *cert. denied* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1982) (victim's name released by police to the newspaper was held not privileged because it was not part of an official report or judicial proceeding yet).[13]

The majority adopts a broad view of Section 611, and cites several cases as authority

13. Those statements which have been held privileged under Section 611 include news releases dealing with official reports by the Governor, *Brandon v. Gazette Publ. Co.,* 234 Ark. 332, 352 S.W.2d 92 (1961) and *Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963), and articles based on official investigation by the state coroner's office, *Painter v. E.W. Scripps Co.,* 104 Ohio App. 237, 4 O.O.2d 388, 148 N.E.2d 503 (1957). *See also Tilles v. Pulitzer Publ. Co.,* 241 Mo. 609, 145 S.W. 1143, 1146 (1912); Note, *Privilege to Republish Defamation,* 64 Colum.L.Rev. (1964).

for this interpretation. However, the cases are not supportive of its position. *Fortney v. Stephan,* 237 Mich. 603, 213 N.W. 172 (1927); *Abram v. Odham,* 89 So.2d 334 (Fla.1956); *Phoenix Newspapers v. Choisser,* 82 Ariz. 271, 312 P.2d 150 (1957); *Borg v. Boas,* 231 F.2d 788 (9th Cir.1956); *Pulvermann v. A.S. Abell Co.,* 131 F.Supp. 617 (D.Md.1955) and *Garby v. Bennett,* 166 N.Y. 392, 59 N.E. 1117 (1902) do not cite Section 611 of the Restatement, and in no way support the idea that the privilege of fair report extend to proceedings of an unofficial nature. These cases dealt with comments about public officials or political candidates, or comments made by legislators when introducing legislation. In the two cases cited which do rely on Section 611 of the Restatement (Second), the cases dealt with official reports requested by the Governor. *Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963); *Brandon v. Gazette Publ. Co.,* 234 Ark. 332, 352 S.W.2d 92 (1961).

Furthermore, only a minority of states have opted for such a broad interpretation of the privilege to cover meetings of "public concern."[14] Generally, states have declined to follow the sweeping implications of the Restatement (Second) and refuse to extend the fair report privilege to these occasions. *See e.g., Yerkie v. Post–Newsweek Stations, supra; Venn v. Tennessean Newspapers, Inc.,* 201 F.Supp. 47 (N.D.Tenn.1962); *Jones v. Neighbor Newspapers, Inc., supra.*

IV. The Statutory Privilege and the Common Law

The majority asserts that the statute dealing with privilege, 12 O.S.1991 § 1443.1, does not replace the common law privilege of fair report because the common law afforded more protection than does the statute, and thus remains in effect. There are two flaws with this reasoning. First, the common law—as developed by American courts—has never extended the fair report privilege to protect press conferences in which news releases disseminate information not contained in any official, judicial, legislative or executive report. Second, even if such an extension could be found in the American common law, Section 1443.1 specifically enunciates those instances in which the privilege is to be extended, and has replaced the common law.

The privilege of fair report as defined in Section 1443.1 has been part of Oklahoma's statutory law since 1910. Rev.Laws 1910, § 2381. The form of the statute has remained substantially the same over the years.[15] The statute restates the fair report privilege as understood and adopted by a majority of the states. *See, e.g.,* Kan.Stat. Ann. § 411.060 (1990); N.Y.Civ.Prac.Law § 337 (1956); Tex.Civ.Code Ann. § 5432 (Vernon 1960). While the language of Section 611 in the Restatement (Second) suggests a more broad rule, states have carefully circumscribed their adoption of this provision. *See, e.g., Phillips,* 424 A.2d at 88–89. Even the comments in the Restatement (Second) indicate that it was not meant to be so broad as to engulf the private individual's remedy for libel.[16]

The American common law has never permitted the fair report privilege to encompass

---

**14.** *See Pinn v. Lawson,* 72 F.2d 742, 744 (D.C.Cir.1934) (privilege included a church board meeting); *Pulvermann v. A.S. Abell Co.,* 131 F.Supp. 617 (D.Md.1955) (Maryland law permitted the extension of the privilege to a political campaign speech); *Warren v. Pulitzer Publ. Co.,* 336 Mo. 184, 78 S.W.2d 404 (1934) (privilege included a church hearing and trial).

**15.** The statute was amended to delete a portion of the statute which stated certain instances in which malice of the publisher could be presumed. This portion was held unconstitutional in *Martin v. Griffin Television, Inc.,* 549 P.2d 85 (Okla.1976), relying on *Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**16.** Comment (d) states that the privilege applies to official proceedings such as judicial proceedings, reports of executive officers, reports of legislative officers. However "[i]t it not clear whether the privilege extends to a report of an official proceeding that is not public or available to the public." Another comment in the Restatement urges that the doctrine be extended to cover any meeting of public concern. However, this idea has met with criticism. One commentator has suggested that the Restatement does not accurately define the privilege, but extends it well beyond the boundaries accepted by American courts. F. Harper, F. James and O. Gray, The Law of Torts § 5.24 (2d Ed.1986). Furthermore, no court, until today, has extended it to this level.

those situations beyond which the Oklahoma statute permits. Both contemplate the protection of statements based on official reports, whether they be, judicial or legislative in nature. *Cobb v. Oklahoma Publ. Co.,* 42 Okla. 314, 140 P. 1079 (1914); *Levine v. CMP Publ.,* 738 F.2d 660 (5th Cir.1984). Both protect official reports which are identifiable by the reader as based on an official report or public record. *Id.* at 668. As justification for the limitation, *Billet v. Times Democrat Pub. Co.,* 107 La. 751, 32 So. 17 (1902) explained that there is no reason to extend the privilege beyond those instances enumerated by statute. By striking a balance, the interests of a free press are preserved while also keeping in tact the individual's interest in being free from defamation. Restatement (Second) § 611, comment (a); *Edwards v. Audobon Society Inc., supra.*

Our statute expressly lists the instances in which a publication is privileged. It is simply a codification of the law which has always been followed in Oklahoma. *See Cobb, supra; Spencer v. Minnick,* 41 Okla. 613, 139 P. 130 (1914). Title 12 O.S.1991, § 2 states that the common law remains in effect only to the extent that it has not been modified by statutory law. Clearly, Section 1443.1 codifies and expressly defines the fair report privilege to be applied in Oklahoma. Unlike the situation wherein there is no indication that the legislature was aware of common law rights, *see Tate v. Browning–Ferris Inc.,* 833 P.2d 1218, 1226 n. 38 (Okla.1992), the language used in the statute privileging legislative, judicial and other official proceedings shows an understanding of the privilege as adopted by American courts.

## CONCLUSION

Any one of these four reasons would compel me to reject the majority's invocation of the fair report privilege to affirm the trial courts' dismissal. I would reject applicability of the neutral reportage privilege for the reason that Ace Wright is admittedly a private person, and that court-created privilege, even in the few jurisdictions that have adopted it, applies only to suits brought by public figures. *See Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting System,*

844 F.2d 955, 961 (2nd Cir.1988). I would reject defendant's reliance on the statutory privilege, as it clearly does not apply. I would allow the suit to proceed in libel under existing law.

I concur that the trial court correctly dismissed Wright's claim based on the tort of outrage.

I am authorized to state that Vice Chief Justice LAVENDER joins in these views.